## Barnes et al. v. Hall.

Dec. 20, 1940.

Rehearing Denied Feb. 14, 1941.

Hubert Meredith, Attorney General, Robert Hensley and Elwood Rosenbaum for Unemployment Compensation Commission.

Edw. C. O'Rear, Allen Prewitt and C. F. Pace for Consolidation Coal Co.

Howard & Mayo for Elkhorn Coal Corporation.

Caldwell & Gray for other appellants.

John Y. Brown and Jos. J. Bradley for appellees.

OPINION OF THE COURT BY JUDGE TILFORD—Reversing.

Section 4748g-9(b) of the Unemployment Compensation Act of 1938, since amended, among other provisions disqualifying an unemployed worker from receiving employment benefits, contains the following:

"If he has left (or partially or totally lost) his employment with an employer because of a strike or other bona fide labor dispute, for any week in which such strike or other bona fide labor dispute is in active progress in the establishment in which he is or was employed, provided that for the purposes of this subsection a lock-out shall not be deemed a strike or a bona fide labor dispute and no worker shall be denied benefits by reason of a lock-out."

The appellant, Carl Hall, an employee of a mining company in Letcher County, and a member of the United Mine Workers of America, District No. 30, was refused compensation because of the quoted provision.

This ruling was made following an opinion delivered by a special agent appointed pursuant to Section 4748g-11 of the 1938 act after there had been filed with the Commission a petition by District No. 30, United Mine Workers of America, for and on behalf of the unemployed coal miners of Kentucky, in which was set forth that the miners had lost their employment through no fault of their own "but because the mines in Kentucky have been closed pending negotiations between the coal operators and the representatives of the coal miners." The petitioner further alleged that the miners were not on a strike but had been locked out by their employers, basing this allegation upon the rejection by the representatives of the coal operators of the following resolution introduced on March 15, 1939, by the representatives of the miners at a joint conference held in New York for the purpose of negotiating a new wage and hour agreement to take the place of a similar contract which had expired at midnight March 31st:

"In order to allay any public apprehension concerning the possibility of a suspension of mining operations in the bituminous coal industry due to the expiration of the existing wage agreement, this Joint Conference

" 'Resolves, That in the event no agreement is reached by March 31, 1939, that work in the industry shall be continued under the existing wages, conditions and contracts pending continuance of negotiations and ultimate success or failure to agree on a new contract.' "

The ensuing paragraph of the petition is as follows:

"Your petitioner further states that at a later date, or on March 31, 1939, a verbal motion was made before the joint sub-committee of the operators and miners to the same effect as the above resolution, and that the operators refused on both occasions to agree to the above proposals to continue work under the terms and conditions of the present existing contract pending negotiations for a new contract, and, therefore, the present situation is not a strike on the part of the employees, but a lock-out on the part of the employers."

The only persons who appealed from the decision

of the Special Examiner, so far as the record discloses, were the United Mine Workers of America ''for and on behalf of the unemployed coal miners of Kentucky,'' and Carl Hall individually.

The Commission, as permitted by the act, designated, as referee to hear and determine the appeal, the Hon. A. M. Hall, who, in a comprehensive opinion delivered on June 5, 1939, affirmed the decision of the Special Agent, finding, among other things:

>''The unemployment of appellants was not due to a lock-out. The Employers were demanding no change in conditions or more desirable terms, but were willing to continue the employment for another two years upon the same conditions that had prevailed for the previous two years.

>''The actions of the miners in ceasing to work in obedience to the fifty years' traditional policy of the union requiring them to quit at the expiration of a contract was tantamount to an 'undeclared strike' on their part.

>''Each and all of the claimants, 'covered employees', left or lost their employment with their respective 'subject Employers' because of a strike or bona fide labor dispute in the respective establishments wherein they were employed within the meaning of Section 9(b) (4) of the Unemployment Compensation Law.''

The referee also held that the ''Compensation Act deals with 'covered employees' as individuals, be they union or nonunion employees and with 'subject employers' as separate units and companies be they members or non-members of an association of employers. Neither the United Mine Workers of America, on the one hand, nor the Coal Operators' Association, on the other hand, has any right to appeal in a proceeding involving the right to or denial of compensation benefits in their own name as such union or association for and in behalf of any of their members, either employee or employer;'' but that Section 25, Civil Code of Practice, was broad enough to permit the appellee, Hall, to appeal on behalf of all other unemployed coal miners similarly situated; that this was Hall's intention, notwithstanding the fact that his petition did not so state; and that the appellees

had waived the question of jurisdiction by their failure to file a special demurrer or plea. The referee's decision was affirmed by the Commission on June 7, 1939.

Section 4748g-11(j) of the act referred to provides in part:

"Within twenty days after the decision of the Commission has become final, any party aggrieved thereby may secure judicial review thereof by filing against the Commission for the review of its decision, a petition in the Circuit Court of the County in which the claimant was last employed by a subject employer whose reserve account is affected by such claims, in which action any other party to the proceeding before the Commission shall be made a defendant. Such petition shall state fully the grounds upon which review is sought, assign all errors relied on, and shall be verified by the petitioner, who shall furnish copies thereof for each defendant to the Commission, who shall deliver one such copy to each of such defendants. * * *

"Such actions, and the questions so certified, shall be heard by the Court in a summary manner upon the record certified by the Commission. The Court shall enter judgment affirming, modifying, or setting aside the order and decisions appealed from, or determining the question of law certified to it by the Commission, and may in advance of judgment, in its discretion, remand the case to the Commission for further proceedings in accordance with the direction of the Court. An appeal may be taken from the decision of the Circuit Court to the Court of Appeals, in the same manner but not inconsistent with the provisions of this Act, as is provided in equity cases."

Within the time limits prescribed by the act a petition was filed in the Letcher Circuit Court captioned:

"Letcher Circuit Court

"District No. 30 United Mine Workers of America, for and on behalf of the unemployed coal miners of Kentucky, and Carl Hall, individually and in his own behalf, and for and on behalf of all other unemployed coal miners and claimants similarly situated,

Plaintiffs

VS      Petition in Equity

No. 5408

V. E. Barnes,
Omer C. Stubbs and
John C. C. Mayo, Jr.,
Members of the Unemployment
Compensation Commission of
Kentucky, and (here follow the names of 107 coal
mining corporations, including the appellants in
this appeal)

Defendants''

And the specified grounds upon which a review was
sought were thus set forth:

"Plaintiffs state further that the Kentucky Un-
employment Compensation Commission erred by its
order affirming the decree of the Referee in holding
that the Plaintiff, District No. 30 United Mine
Workers of America, was not a proper party there-
in, and that it had no right to appeal in its name
for and on behalf of the unemployed coal miners
in District No. 30, located in the eastern district or
section of Kentucky, and for and on behalf of all
other unemployed coal miners similarly situated.

"The Commission erred in its order affirming
the decree of the Referee wherein it was held that
the lack of employment of the miners claiming bene-
fits was due to a bona fide labor dispute, rather
than a lock-out and a refusal upon the part of the
mine operators to employ claimants as contended
by plaintiffs herein.

"The Commission erred in its order in affirm-
ing said decree in holding that there was a volun-
tary cessation of work by all 'covered employees.'

"It further erred in its order affirming the de-
cree by holding that the coal miners ceased to work
because of a controversy with their employers over
the terms and conditions of a proposed contract.

"The Commission erred in holding that the rec-
ord disclosed that the operators desired to operate
their mines, and in further holding that each and
all of the respective coal companies in the proceed-

ing, their establishments and employees were directly affected by a labor dispute, and the claimants left, or partially or totally lost their employment because of a strike or other bona fide labor dispute.

"The Commission erred in its order affirming the decree of the Referee in disallowing and refusing the claim of plaintiff, Carl Hall.

"The plaintiffs further state that the claims for benefits filed by the unemployed miners with the Kentucky Unemployment Compensation Commission are just, due, and owing to said claimants, and have never been paid; that their lack or want of employment was through no fault of their own, but was due to a lock-out upon the part of their employers."

Many of the defendants named in the caption filed pleas in abatement, alleging that they had never engaged in business in Letcher County and that by the terms of the act the court had no jurisdiction over them, and as a result of these pleas the action was dismissed as to the defendants so situated. Others of the defendants, who are now appellants in this court, moved to dismiss the action as to all of the plaintiffs except Carl Hall individually, or specially demurred to the petition, on the ground that the union was not a proper party, and that neither it nor Hall had capacity to sue or maintain the action for the benefit or on behalf of any other claimants of unemployment compensation.

The court dismissed the action as to "District No. 30, United Mine Workers of America," but overruled all objections in whatever form made to the maintenance of the action by Hall for the benefit of all other coal miners similarly situated. Answers were filed traversing the material allegations of the petition, and on January 30, 1940, the court delivered a written opinion holding that at midnight, March 31, 1939, the date on which the existing two-year contract between the coal operators and the union expired by its terms, the miners automatically became unemployed, and hence, that their unemployment, resulting from the failure of the parties to agree on the terms of a new contract or upon the period during which employment should continue under the old, was not the result of a labor dispute within

the meaning of the quoted disqualifying provision of the act but of the cessation of the relationship of employer and employee. On February 17, 1940, a judgment pursuant to this opinion was entered, reversing the decision of the Commission and directing it to pay unemployment compensation to Carl Hall and the other coal miners similarly situated in Letcher County "by reason of their unemployment beginning at midnight of March 31, 1939," and granting the defendants an appeal to this court.

At its threshold we are met by the question, whether the union or Carl Hall had the right to appeal or otherwise act for other coal miners alleged to have been similarly situated, but, in view of the importance to the public of the major issue involved and the fact that the 1940 act prescribes a procedure which, in future, will obviate the technical difficulties here encountered, we have concluded to treat the major issue as properly before us for determination.

The evidence on behalf of the appellants consisted of the testimony of three witnesses, namely, Carl Hall, Sam Caddy, and George Titler. The first named, a member of the local mine committee and a loader for the Consolidation Coal Company, admitted that he did not report for work at the mine after March 31, 1939, and was unable to recall whether he had instructed others not to go to work. In any event, none of the officials of the company notified him not to report, and he had no "idea" whether his return was expected. The following appears in his cross-examination:

"Q. I want to ask you if it isn't the universal practice in the union field when those contracts expire, unless a specific provision is in the contract or specific arrangements are made to the contrary that as soon as the contract expires, the union men are under obligation to stay out until they get a new contract? A. I couldn't say. It looks like possibly that is the way it would be.

"Q. Don't you know that is the practice? A. It seems it is."
And again:

"Q. If they (the company) were to call you saying, Mr. Hall, come back, we want to put you

back to work, would you go back or even talk about it unless you first had instructions from your superior officer in the Union? A. I could not answer that.''

Mr. Caddy, President of District No. 30 of the United Mine Workers of America, and a member of the scale committee in 1937 which had negotiated the contract which expired March 31, 1939, testified that the heretofore quoted resolution offered by the representatives of the miners to continue work under the existing wage conditions and contracts pending negotiations was rejected by the representatives of the operators; that prior to the date of the introduction of this resolution the operators had demanded a substantial reduction in the wages to be paid but had abandoned that demand on March 30th; that on the latter date the representatives of the miners again offered to continue work under the existing contract until October 1, 1939, and that this offer was countered by an offer from the representatives of the operators to renew the existing contract for a period of two years. He denied that any strike order had been issued by the union, but admitted that the miners would not work under the situation resulting from the deadlock, saying in answer to a question as to why the men in his field did not go to work on April 1st:

"A. Judge Dawson hit the nail on the head—what is the use of trying to mislead the Examiner or the general public, Judge Dawson and I and all the coal miners in the State know that at the expiration of a contract, the miners do not work in the mines unless they do have a contract where it is governed by the Union. They attempted to make this new contract and are still attempting to make the new contract, and neither operators nor miners—the mine owners would not open the mines during the negotiations after the expiration of the old contract.''

We quote further from his testimony:

"Q. But it did not bind the operators to observe the old contract after April 1? A. The contract automatically expired as a result of the time.

"Q. And the right of both parties under that, except as to maintenance crews and the continuation of a negotiating committee, ended? The rights

of the parties under the contract itself ended when the contract ended on March 31, didn't it? A. I would not answer your question in the affirmative because I believe there is an equity that the miners would have in connection with the situation at the mine. For instance, if I answered your question if I say everything ended, that would mean the end of the union.

"Q. I meant about the wages to be paid. A. I would say all wages and working conditions that were established by the contract terminated March 31.

"Q. That being true, I believe you have already stated at the beginning of your testimony that it was the traditional practice of the union members, the policy of the union itself, that when a contract by its terms expires, then the men refrain from working at their customary employments at the mine until a new contract is negotiated, unless there was some sort of a temporary arrangement made between the employer and employees' representatives to continue work during the negotiations? A. I have worked in the mine now for a good many years prior to being an officer in the United Mine Workers and it would be my individual program not to work in any mine unless I had a contract.

"Q. Isn't that the policy of the Union? A. That is the traditional policy over a period of fifty years. There is no strike order sent out but it is the same thing as to the operations. Take the Hazard Field—they do not even have penalty clause in their contract.

"Q. Isn't it a part of the Union regulations that where the Union has a contract with the mines over the field and that contract runs out, unless there is some temporary arrangement between the parties, the Union miners must refrain from work until orders to the contrary? A. I would not say 'must,' I would say if operators and miners have failed to bring about an arrangement before the termination date to continue under a temporary agreement of some kind, there would not be any work.

170

"Q. Does not your Union teach its membership and expect of its membership upon the expiration of such a contract in the absence of some temporary arrangement that they should refrain from work until a new contract is negotiated? A. A mine workers' union would expect from its members the same loyalty as a coal operators' association would expect from its members."
And again:

"Q. Do you mean to tell the Examiner that you do not know whether you publicly announced since April 1, that the United Mine Workers would not go back to work until the contract was signed? A. I don't think I made the statement in the way you refer to.

"Q. Have you by your public statement attempted to convey to the public, to the members of your Union, and to the operators that running of coal will not be tolerated until the new contract is signed? A. I will answer your question this way,—I told our miners we are defending our position to the very best of our ability.

"Q. Haven't you proclaimed that your men did not intend to go back to work and did not intend to let these mines run coal until a new contract was negotiated? A. No, I have not. I said there was not very much coal going on the track until a new contract was negotiated, if that is what you are referring to."
And again:

"Q. Over in the Hazard field do you recall the question that arose as to whether the Algoma Block Company would be permitted to operate sufficiently to furnish coal to the power plant and did you issue some form of permit permitting them to run to that extent? A. I think you will understand in line with our policy of maintaining the property keeping them in shape to work after the matter is all over, that the Algoma Block mine supplied coal to a power plant that was necessary to keep up pump operations and that was in line with the agreement with the coal operators in New York. I didn't want them to have those mines flooded, so I told them what to do.

"Q. Did you give this permit orally or in writing? A. Orally over the telephone. It was to Dave Prichard, I was in New York at the time. I told him to go ahead and let the mine run and furnish the coal to the plant. There was an agreement between the operators and miners in New York, there was a joint agreement entered into in New York that we would maintain these properties and provide coal. The operators agreed to continue the present wage scale subject to any changes which might take place."

Mr. Caddy further testified that there was a minority group among the operators who desired a temporary shut-down in order to permit the marketing of surplus coal, but who these operators were, and whether any of them were Kentucky operators, was not shown.

Mr. Titler was introduced by the appellants to rebut the testimony of Mr. A. R. Matthews for the coal operators that he had received a letter dated at Harlan, Kentucky, April 4, 1939, on the letterhead of the United Mine Workers of America, reading "Just rec'd orders from International Hdgr's in New York not to allow production of any coal until contract is signed," and signed "Geo. J. Titler, Acting Pres. of Dist. No. 19 U. M. W. of A." Mr. Matthews had testified that on behalf of the Clover Splint Company of Harlan County, he had called Mr. Titler over the telephone and requested permission to complete ventilation and haulage entries, and that before receiving the letter, which he produced and identified, Titler had told him to "go ahead." Mr. Titler, when introduced as a witness by the appellants, admitted writing the letter but stated that it had no reference to anything but maintenance work. He also testified that "several" coal operators in Kentucky and Tennessee had told him that they wanted a shut-down in order to get rid of surplus coal.

The testimony for the operators may be summarized more tersely. In one or more counties in the affected area the operators were prevented from continuing mining operations by picketing and by violence, and other operators in other counties were notified by the miners or their representatives that they would not work until the new contract was signed.

In order to expedite the hearing before the Ex-

aminer, a statement of the Hon. Charles I. Dawson, representing certain employers, was permitted without objection to be filed on behalf of his clients, reciting that each was "prepared to present to the Examiner evidence to the effect that they have not operated their respective mines for the production of coal since March 31st, 1939, but have worked only such men as were necessary to maintain the mine in working condition, such men being engaged in keeping the mine free from water, from falls, the repair of track and similar work, the maintenance crews being kept at work as a result of an agreement with the Union representatives that maintenance crews could be maintained; that the reason they have not tried to run coal since March 31, 1939, is the fact that they felt that if they attempted to run they would be picketed and that there would be serious danger of conflict between those desiring to work and the pickets, that might result in persons being injured, and that their refraining from work has been due solely to their desire to avoid trouble pending the time negotiations are in progress for the execution of a new contract with the United Mine Workers of America, and that their failure to work has in no sense been due to any purpose, desire, or intent to force their employees to agree to any terms or conditions of work; and that none of them has made any demand upon their employees that they agree to any conditions demanded by them in respect of wages, hours, or other working conditions at the mine; and that the companies named are willing that the foregoing statement may be treated as their evidence on this hearing provided the representatives of the employees agree and the Examiner permits such statement to be so used with the same effect as if sworn to in open hearing."

The record also contains a statement by the Hon. Robert T. Caldwell, of counsel for the employers, to the effect that it was his understanding that the purpose of the hearing was to obtain information as to the general situation, and that having introduced three witnesses showing the typical condition in their respective areas, he desired to agree with opposing counsel on a statement with respect "to matters occurring in New York for the purpose of answering the testimony of Mr. Caddy on the same subject, or if such a statement cannot be agreed upon with counsel, then desire to have the

necessary time to obtain this proof by deposition." The record then recites, "in accordance therewith the following affidavit was introduced, it being agreed that the parties mentioned therein would testify as mentioned therein, the truth of the testimony not being thereby admitted, however." The affidavit follows:

"Robert T. Caldwell being duly sworn states that he is counsel of record in the foregoing proceeding for certain operators participating therein; that he is informed and believes and therefore alleges that either Harry Laviers * * * Price or Robinson, who participated in negotiations in the City of New York between representatives of the Kentucky Coal Operators and the United Mine Workers which have been referred to in the testimony given herein by Mr. Sam Caddy, or one or more of said witnesses, if present, would testify in substance that when offer was made by the United Mine Workers to the operators' representatives to continue work indefinitely pending further negotiations for new contract, and which offer was stated by Mr. Caddy, to have been made on or about March 14, 1939, that in rejecting said offer the conferees representing the employers made a counter proposition for the renewal of the existing contract for a period of two years from April 1, 1939, which counter-proposition was in turn rejected by the representatives of the United Mine Workers. Also that when the second offer referred to by Mr. Caddy as having been made March 30, 1939, to extend the old contract for a period of six months to October 1, 1939, was made by the United Mine Workers and rejected by the operators, that the operators in turn renewed their counter-proposition to extend or renew the existing contract for a period of two years from April 1, 1939, which counter-proposal was in turn rejected by the representatives of the Mine Workers."

It should, perhaps, be noted that the evidence for the appellees showed that in many instances at least the operators continued to extend credit for necessities to the idle mine workers, who, in turn, continued to occupy houses leased from the companies.

If the foregoing synopsis of the evidence is lacking in details, it is because of our conviction that the deci-

sion of this case turns upon the proper construction to be placed on the undisputed facts in the light of the legislative intent which inspired the creation of unemployment compensation.

It is the contention of counsel for appellees that the miners lost their employment through the expiration on March 31, 1939, of the contract between the operators and the union, and not as a result of a "labor dispute," since such a dispute could exist within the meaning of the disqualifying provision of the statute only between employers and employees, a relationship which, in their case, automatically terminated at midnight of that date. They further contend that the rejection by the operators of the resolution offered by the miners that they continue work until October 1, 1939, under the terms of the existing contract constituted a "lock-out" within the meaning of the clause of the act stipulating "a lock-out shall not be deemed a strike or a bona fide labor dispute, and no worker shall be denied benefits by reason of a lock-out."

The term "labor dispute" is defined by the National Labor Relations Act, Section 2, Subsection 9, 29 U. S. C. A., Section 152(9), as follows:

"The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

The Norris-LaGuardia Act, 29 U. S. C. A., Section 113(c), defines the term as follows:

"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

It may be argued that the definitions above quoted are applicable only to situations governed by the par-

ticular acts in which the definitions appear, but since the Kentucky Unemployment Compensation Act (1938) by the mandatory requirements of the Federal Social Security Act, 42 U. S. C. A., Section 1103, contains the express provision that an otherwise eligible worker shall not be denied benefits because of his refusal to accept work "If the position offered is vacant due directly to a strike, lockout or other labor dispute"( Section 4748g-9(b)(3), it is at least a reasonable presumption in the absence of a definition in the Kentucky act that our Legislature intended to use the term "labor dispute" wherever it appeared in Section 4748g-9 in the same sense that it was employed in the National Labor Relations Act (1935) and the Norris-LaGuardia Act (1932) which were enacted prior to the Federal Social Security Act.

In the case of Iron Molders' Union No. 125 v. Allis-Chalmers Co., 7 Cir., 166 F. 45, 52, 20 L. R. A., N. S., 315, the terms "strike" and "lock-out" are defined, the court saying:

> "A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lockout is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms. Neither strike nor lockout completely terminates, when this is its purpose, the relationship between the parties. The employees who remain to take part in the strike or weather the lockout do so that they may be ready to go to work again on terms to which they shall agree—the employer remaining ready to take them back on terms to which he shall agree. Manifestly, then, pending a strike or a lockout, and as to those who have not finally in good faith abandoned it, a relationship exists between employer and employee that is neither that of the general relation of employer and employee, nor again that of employer looking among strangers for employees, or employees seeking from strangers employment."

See, also, Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F. (2d) 134, 112 A. L. R. 948; Panzieri-Hogan Co., Inc., v. Bender, 205 App. Div. 398, 199 N. Y. S. 887; and Restful Slipper Co., Inc., v. United Shoe & Leather Union et al., 116 N. J. Eq. 521, 174 A. 543.

If it should be assumed that a labor dispute within the meaning of the act could exist only between employer and employee, an assumption not supported by reason or any limitation contained in the act, or by definitions found in social security legislation, the fact remains that there is no evidence in this record that the contract which expired on March 31, 1939, was a contract of employment, or that its expiration terminated the relationship of employer and employee theretofore existing between the appellants and the miners employed by them. The contract was not introduced in evidence, and the facts shown indicate that it merely regulated the wages, hours, and privileges of those members of the union whom appellants had theretofore employed or might thereafter engage, and who, in turn, were privileged as individuals to terminate or renew their respective employments at will.

Even if it should be conceded that the expiration of the contract between the operators and the union caused the miners to become unemployed at midnight, March 31, 1939, the dispute as to whether they should continue to work for a period of six months from that date under the terms of the contract, pending negotiation of a new contract, or whether, as the operators proposed, the expiring contract should be renewed for a period of two years, was the immediate cause of their remaining unemployed, unless at some time following March 31st, they had been locked out. If there had been no dispute, there would have been no unemployment, notwithstanding the expiration of the contract which would have occurred in any event, from which it would appear that the expiration of the contract was not the cause of the unemployment but an incident wholly unrelated to the resulting status. From these considerations it would seem that the conclusion is inescapable that the miners lost their employment, and, in the absence of an intervening "lock-out," remained unemployed until the new contract was executed in May 1939, because of a bona fide labor dispute.

A more specific definition of a "lock-out" than the definition heretofore quoted from the Iron Molders' Union No. 125 case, supra, is found in the referee's opinion citing a previous opinion of the Kentucky Commission in the case of Black Diamond Coal Company's Rec'r v. J. M. Adams. It is as follows:

"A cessation of the furnishing of work by one or more 'subject employers' to their 'covered employees' in order to get for that 'subject employer or employers' more desirable terms than then existed in the unit and establishment wherein said 'covered employees' had been employed."

The contention that the rejection by the operators of the miners' proposal to continue work for six months under the terms of the old contract pending negotiations for a new constituted a "lock-out," finds its only support in the conclusion drawn by appellee's counsel and the representatives of the union, that if the miners had been willing to work the appellants would not have permitted them to do so. Prior to the expiration of the old contract, the operators had abandoned any attempt to secure a reduction in wages and had offered to renew the existing contract for a period of two years. Hence, so far as the record shows, there is nothing to support an assumption that the appellants desired to cease operations in order to obtain more desirable terms from their employees. Abandoning theories and examining the proven facts, we find no evidence indicating that any one of the appellants either desired to close its mines, or actually did so. On the contrary, the evidence clearly indicates that the only reason they did not continue to operate was the refusal of the union miners to work until an agreement had been reached by the negotiators representing the union and the operators. There is no evidence whatsoever that any miner who offered or was willing to work was refused employment by any one of the appellants.

We cannot subscribe to the doctrine that workmen to whom continued employment is offered may reject it and thus create a status entitling them to unemployment compensation, where, as in this case, the employment offered in no respect differs from that in which they had been previously engaged. The purpose of the act was to provide employment for those unfortunate victims of a maladjusted economy who are unable to obtain suitable work at a living wage—not to enable those who are offered continuation of an existing employment to refrain from work until they have secured advantages in addition to those previously enjoyed. If substantial disadvantages had been imposed on the miners employed by appellants by the terms of the renewal

contract offered, without accepting which they could not have continued work, a different question would have been presented, for it is not difficult to conceive of terms so onerous that their rejection by the employee would not be inconsistent with his right to receive unemployment compensation. Insistence on onerous terms by an employer, accompanied by a threat of dismissal if not accepted, might, under certain circumstances, constitute a "lock-out." But that case is not this case. Here, the representatives of the operators offered to renew for two years a contract under which the employees had worked for the preceding two years, and the only change suggested by the miners, so far as this record discloses, was that the "penalty" clause be eliminated or a "closed shop" clause inserted. These may have been commendable objectives. Undoubtedly the miners had the right to insist upon them and to refuse to continue work under the expiring contract for a longer period than they elected. But none of these considerations militates against the fact that the miners could have renewed the existing contract for a period of two years, and by refusing to do so, whether wisely or unwisely, brought about their own unemployment.

The conclusions herein announced find support in the opinion of the Court of Appeals of Alabama in the case of Department of Industrial Relations v. Pesnell, 199 So. 720, and we are informed that the majority of state commissions have reached the same conclusion with respect to similar unemployment for which compensation was sought under statutes differing only slightly from the Kentucky act. No appellate court decision to the contrary has been cited.

Judgment reversed, with directions to dismiss the petition and affirm the decision of the Commission.

Whole Court sitting, except Judge Perry.

Chief Justice Ratliff dissenting.