DESHLER BROOM FACTORY, APPELLEE, V. V. B. KINNEY, STATE LABOR COMMISSIONER, ET AL., APPELLANTS.

2 N. W. (2d) 332

FILED FEBRUARY 6, 1942. No. 31225.

*John E. Sidner, Ray W. McNamara* and *Allen Wilson,* for appellants.

*Perry, Van Pelt & Marti* and *J. P. O'Gara, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

CARTER, J.

This is an action brought under the provisions of the Nebraska unemployment compensation law. The claims of 212 employees of the Deshler Broom Factory were filed in three separate actions and consolidated for purposes of trial. The district court found against the claimants for benefits under the unemployment compensation act, and the claimants, together with the state labor commissioner, have appealed.

The evidence shows that the 212 claimants involved herein were employed by the Deshler Broom Factory and on October 11, 1939, became unemployed and filed claims for benefits under the unemployment compensation act. It is the contention of the employer that claimants are disqualified from receiving benefits for the reason that the unemployment was caused by a stoppage of work due to a labor dispute, a disqualification set out in the act (Comp. St. Supp. 1939, sec. 48-705).

The claims were first heard by a deputy commissioner, who found for the claimants. An appeal was lodged with the appeal tribunal provided for in the act, which sustained the decision of the deputy commissioner. The employer thereupon petitioned the district court for a review of this finding in accordance with the provisions of section

48-706, Comp. St. Supp. 1939. On the trial of the case in the district court, the court permitted the introduction of additional and new evidence, to which objection was timely made on the ground that the case, under the unemployment compensation act, was required to be heard on the record made before the appeal tribunal. Subsection (h) of section 48-706, Comp. St. Supp. 1939, states in part: "In any judicial proceeding under this section, trial *de novo* shall be had to the judge of such court." There is no other language restricting the scope of the investigation to be made by the district court. The district courts of this state are courts of general jurisdiction, and in the absence of specific statutory restriction a provision of statute providing for an appeal to and a trial *de novo* in the district court contemplates a trial in the commonly accepted sense of that term in a court of general jurisdiction, including the right to produce evidence in the same manner as if the action had originated in the district court.

The undisputed evidence shows that on October 11, 1939, claimants had back wages due and unpaid for September, 1939, and approximately $6,000 due for wages earned prior to September 1, 1939. On the morning of October 11, 1939, a written notice was given to the manager of the factory to the effect that employees would cease work at 3 p. m., unless September wages were paid in bankable checks before that time. The notice was not signed, but the name "International Broom & Whisk Makers Union, Local #20" was typed at the bottom. The manager called in the officers of the union and informed them that the conditions could not be met. At 3 p. m. of said day practically all of the employees quit work and left the plant. There is evidence that arguments, persuasive in character, were used to induce reluctant employees to join in the walkout. Picket lines were established, but there is no evidence of force or coercion being used by picketing employees. In fact, the conduct of all the employees seems to have been very commendable.

The record further discloses that a meeting of employees

was held on the evening of October 10, 1939. Both union and nonunion employees attended and participated in the meeting. The officers of the union presided and apparently produced and offered for consideration the letter which was subsequently presented to the manager of the factory. There is much evidence produced in an effort to determine whether or not the walkout was union inspired. For reasons to follow, we do not think that it is important whether the trouble was the result of union activity or not.

It is shown by the evidence that the negotiation of a wage and hour contract was underway at the time of the occurrences herein recited. Meetings had been held in August and September which had resulted in tentative agreements on most of the matters in dispute. The contract was finally executed on October 21, 1939. The argument is advanced that the real purpose of the walkout was to coerce the employer into making a satisfactory wage and hour agreement. We think there is some basis for this contention, but we do not think that it is a controlling issue in this case.

The question is: Was the unemployment caused by a stoppage of work due to a labor dispute? In the consideration of this question we conclude at the outset that employees may quit their employment and seek employment elsewhere without intention of returning, without subjecting themselves to the charge of carrying out a strike. A strike, in the common acceptance of the term, is the act of quitting work by a group of workmen for the purpose of coercing their employer to accede to some demand they have made upon him, and which he has refused. *Uden v. Schaefer,* 110 Wash. 391, 188 Pac. 395. But it is not a strike, nor does it constitute a labor dispute, for employees to quit work, singly or collectively, when they quit without any intention to return to the employment, whatever their motivating reason for so doing may have been. But such was not the case here. Conceding for the sake of argument that the claimants in this case stopped work because they had not been paid their past-due wages, that fact does not

necessarily preclude a finding that a labor dispute existed. If the employees had quit with the purpose of seeking other employment and of enforcing their claims for wages in the courts, there would have been no labor dispute within the meaning of the law. But this they did not do. They attempted to enforce collection by concerted, coercive action against the employer. They attempted to force collection by closing down the factory and to gain their desired ends by producing in the mind of the employer a fear of subsequent losses that would naturally result from a sudden stoppage of business. The formation of picket lines shows the intention of claimants to coerce the employer by attempting to keep the factory from operating after they had quit. Their conduct and actions indicate clearly that they retained an expectation to return to work when the object of the walkout was successfully completed. The fact that the purpose of the walkout may have been the collection of past-due wages makes it no less a labor dispute under the circumstances shown. The means employed were identical with those ordinarily used to obtain a closed shop, better wages, shorter hours or better working conditions. It was simply a labor dispute involving past-due wages instead of future wages. In brief, disqualification under the act depends upon the fact of voluntary action and not the motives which brought it about. Clearly, it was a labor dispute within the meaning of section 48-705, Comp. St. Supp. 1939.

The evidence shows that more than 90 *per centum* of the employees quit work at the appointed hour on October 11, 1939. The factory was not able to continue operation. There being a substantial curtailment of work in the factory, it constituted a stoppage of work within the unemployment compensation law.

The trial court, in an able opinion appearing in the record, summarized the evidence showing that a labor dispute existed, in the following language: "On the issue of whether the unemployment of the claimants was due to a stoppage of work which existed because of a labor dispute,

the record shows the following: (1) Formal notice of the meeting of employees of October 10th was posted in the factory for the notice of *all* employees. (2) This notice was posted and signed not by individuals but by the representatives of an organized group. (3) All employees, whether members of the organized group or not, were invited. (4) At the meeting discussion and deliberation took place. (5) Formal action by motion was taken. (6) A formal vote was taken. (The fundamental theory of the ballot is that the judgment and will of the majority shall be substituted for the judgment and will of the individual and shall override the judgment and will of those in the minority.) (7) Representatives of the group were designated and instructed. (8) A formal demand was made upon the employer and a very limited time was allowed for compliance. (This action indicates an opinion of at least part of the employees that the employer could pay if inclined to do so. In other words, that there was a dispute over the time of payment of wages as distinguished from ability of employer to pay. That the time and manner of payment may be the basis of a labor dispute and the reason for a strike, as well as rates of pay, working conditions, and so forth, is generally known and is illustrated by the record in the case of negotiations leading up to and the contract finally consummated between the employees and employer.) (9) Almost all the employees walked out at an hour different from the usual quitting time and at a preconcerted time. (10) Some sought to and did influence others to walk out by persuasion, threats and shutting off of power and light. (11) A picket line was established which was none the less a picket line with the usual purpose because it was creditably peaceful and nonviolent. (12) The management was advised that unless all were taken back none would go back. (13) The record shows affirmatively that some were influenced to walk out by others, another to quit who had not walked out on October 11th and another who was on his way to work was influenced to go fishing instead. (14) Words were used and conduct re-

sorted to which could have had no other design than to influence employees to become or remain idle. (15) Mr. Brewer was notified by wire that 'walkout' was in effect. (If the action represented the coincidental decision of employees acting individually, there would seem to be no occasion to advise any one of it.) (16) All the while these things were happening there was hanging fire the matter of a labor contract between the local union and the employer. In the face of these facts the action of October 11 can hardly be said to represent the simple determination by individuals to exercise the clear right of an employee to quit because of nonpayment of wages. It cannot be questioned that an unknown number of claimants were influenced to render themselves unemployed by the concerted action of those who called, attended and participated in the meeting of October 10 and the follow up of that meeting and that an unknown number were forced into idleness by the stoppage of work which resulted." We think these facts, amply borne out by the record, show that a labor dispute caused the stoppage of work.

In *Bodinson Mfg. Co. v. California Employment Commission*, 101 Pac. (2d) 165 (Cal. District Court of Appeal), the court said: "The law recognizes the right of peaceable picketing but not of the use of force and violence. It is conceded that workmen belonging to another labor group passed through the picket line and continued to perform their usual labor in the plant throughout the period of time which is here involved. Those men exercised their personal volition to work and continued to do so without personal violence or harm. It follows that the correspondents exercised their volition not to pass through the picket line or to work in the plant while the trade dispute and strike were in progress. * * * This trust fund was not created to be used as a weapon to coerce employers to submit to the demands of striking employees by paying the maintenance of workmen while they engage in prosecuting a strike. Nor was it intended to be used as an instrument to aid strike-breaking. On the contrary, it was enacted

for the avowed purpose of assisting workmen while they are out of employment through no fault of their own. It is specifically provided that they may not recover benefits if they leave their work on account of an existing labor dispute in the plant where they are employed. The record is undisputed that the correspondents left their work at the petitioner's plant solely because of the existence of a labor dispute in that establishment."

The unemployment compensation act does not purport to grant benefits to workmen who leave their work voluntarily; neither does it intend for an employee to benefit from the act while his bargaining agents are attempting to adjust their differences with the employer. That is not the ordinary conception of unemployment. Voluntary idleness under such conditions is not unemployment. It would be extremely difficult for us to reach the conclusion that claimants could voluntarily bring about a cessation of work and then claim they were unemployed within the provisions of the act. The fact is that claimants quit work in an attempt to secure a satisfactory agreement as to the payment of past-due wages. The terms of the adjustment were controversial, due in a large part to the inability of the employer to pay. Claimants were voluntarily out of work because they elected to use this method of coercing payment. That makes it a labor dispute. *Department of Industrial Relations v. Pesnell*, 29 Ala. App. 528, 199 So. 720. See, also, *Barnes v. Hall*, 285 Ky. 160, 146 S. W. (2d) 929.

We conclude that the unemployment for which compensation is claimed resulted from a stoppage of work caused by a labor dispute and is not compensable. The trial court was therefore correct in holding that appellants could not recover.

AFFIRMED.