ARAGON et al. v. UNEMPLOYMENT COMPENSATION COMMISSION OF TERRITORY OF ALASKA et al.

No. 4620–A.

District Court of Alaska. First Division. Juneau.

May 2, 1942.

238

Andersen & Resner, of San Francisco, Cal., for petitioners.

Grover C. Winn, of Juneau, Alaska, for Commission.

Faulkner & Banfield, of Juneau, Alaska and Pillsbury, Madison & Sutro, of San Francisco, for Alaska Packers Ass'n and others.

ALEXANDER, District Judge.

This cause is here on a petition for review, filed by Frank L. Aragon, on behalf of himself and others similarly situated, hereinafter called the "Claimants," as petitioners, against the Alaska Unemployment Compensation Commission, (hereinafter called "the Commission"); the members of said Commission and the employers involved; and concerns the right of the Claimants to unemployment compensation benefits under the Alaska Unemployment Compensation Act (hereinafter called "the Act"), Chap. 4, Extraordinary Session Laws of 1937, as amended by Chaps. 1 and 51, S.L.1939, and particularly the question of whether § 5(d), Chap. 4, Extraordinary Session Laws of Alaska 1937, as amended by § 25, Chap. 1, S.L.Alaska 1939 disqualifies the Claimants from receiving benefits thereunder, it having been decided by the Commission that their

unemployment was "due to a labor dispute which is in active progress at the factory, establishment or other premises at which he is or was last employed."

The pertinent parts of Section 5 of Chap. 4 as amended, are here quoted:

"*Section 5.* Disqualification for Benefits. An individual shall be disqualified for benefits: * * *

"*Section 5(d).* For any week with respect to which the Commission finds that his total or partial unemployment is due to a *labor dispute which is in active progress* at the factory, establishment or. other premises at which he is or was last employed; *provided, that such disqualification shall not exceed the 8 weeks* immediately following the beginning of such dispute; and provided further, that this subsection shall not apply if it is shown to the satisfaction of the commission that:

"(1) He is not participating in or directly interested in the labor dispute which caused his unemployment; and

"(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the dispute, there were members employed at the premises at which the dispute occurs, any of whom are participating in or directly interested in the dispute."

The Claimants here contend they are entitled to be paid full benefits under the Act for their unemployment during the 1940 Alaska salmon season, or, at least, that the Referee's decision should be restored and given full effect.

Their claims were first considered by an Examiner of the Commission, who denied them benefits, except after the first eight weeks following the opening of the season at the canneries in question, under the provisions of § 5(d) of the Alaska Unemployment Compensation Act, on the ground that "their unemployment was due to a 'labor dispute' in active progress at the establishment at which they were last employed." Thereafter, a Referee was appointed to take testimony and report his findings and conclusions to the Commission, who denied the claims as to Karluk and Chig-

nik, but upheld them as to Bristol Bay. The matter was then considered by the Commission itself, which overruled the Referee as to Bristol Bay and sustained the Examiner, denying all benefits to the Claimants except after the first eight weeks following the opening of the season at the canneries in question.

Review of the Commission's decision is now sought by the Claimants in this Court, under authority of Section 6(i), Chap. 4, Laws of Alaska 1937, Ex.Sess., which provides:

"(i) Court Review. Within thirty days after the decision of the Commission has become final, any party aggrieved thereby may secure judicial review thereof by commencing an action in the United States District Court against the Commission for the review of such decision, in which action any other party to the proceeding before the Commission shall be made a defendant. * * * In any judicial proceeding under this Section, the findings of the Commission as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said Court shall be confined to questions of law."

It will be noted that Section 6(i) provides that: " * * * In any judicial proceeding under this Section, the findings of the Commission as to the facts, if supported by evidence and in the absence of fraud, shall be conclu-, sive, and the jurisdiction of said Court shall be confined to questions of law."

■ Furthermore, if (Petitioners) Claimants were not satisfied with the reasons given by the Commission for its decision in the notification of its decision given them, the Act provides they may appeal therefrom within a specified time. Having failed to do so they cannot now complain on that score. See §§ 6(c) and 6(e) of the Act, as amended.

■ There is no claim of fraud in this case, and hence the only questions for decision by this Court are whether the findings of fact made by the Commission are supported

by evidence, and whether the conclusions thus reached are correct in law.

Before it passed upon the claims of the Claimants herein the Commission referred this matter to a Referee who, after due notice to all interested parties, took voluminous and exhaustive testimony, which has been certified to this court and is now before us for examination.

From this record it appears that the Claimants (Petitioners herein) are all members of the Alaska Cannery Workers Union, Local No. 5 of San Francisco, a local union of the United Cannery Packing and Allied Workers of America, hereinafter designated as the "Union," said union being affiliated with the Maritime Federation of the Pacific. All the Claimants were employed during the 1939 canning season by the Alaska Packers Association at Chignik and Karluk (in central Alaska) and by the Red Salmon Canning Company, the Alaska Salmon Company, and the Alaska Packers Association in Bristol Bay. These concerns will hereinafter be designated as "the Employers." All of the Claimants reside in the San Francisco Bay region, and the Employers all operate salmon canneries in Alaska but have headquarters in, and operate out of San Francisco.

Both parties appeared before the Referee and submitted evidence in support of their contentions. The Employers maintained that the unemployment of Claimants was due to a "labor dispute" which was "in active progress at the * * * premises at which he (the Claimants) is or was last employed." The Claimants took the opposite stand.

The Referee found the Alaska salmon fishing and canning industry to be a seasonal one, extending approximately from April into September of each year; that the Commission had promulgated regulations wherein, for the purpose of the Act, the opening and closing days of the salmon season for various places in Alaska are fixed; at Karluk from April 5 to Sept. 5; at Chignik from April 1 to Sept. 10; and at Bristol Bay from May 5 to Aug. 5 (Benefit Regulation No. 10).

From the inception of the industry in Alaska the salmon fleets carrying supplies, fishermen and cannery and other workers, have sailed from San Francisco for the annual season to Karluk, Chignik and Bristol Bay. The Employers for many years past have operated under agreement with the Alaska Fishermens Union, and in more recent years have worked under agreement with other unions. The Employers and the Alaska Cannery Workers Union, Local No. 5, representing Claimants herein, entered into their first agreement with these employers in 1936, and continued to operate in each succeeding season under such agreements until and during the 1939 season. Their 1939 agreement provided that either party might terminate it at the close of the season, or before the following season, and that the parties would then proceed to negotiate a new agreement. The 1939 agreement was terminated in accordance with this provision in November of 1939, and negotiations for the 1940 season contract commenced in March, 1940. These negotiations continued at San Francisco until about April 1st, with propositions of settlement being made by first one and then the other of the parties in interest. At these negotiations the Claimants were represented by officials of their union and the Employers by the Alaska Salmon Industry, Inc., a corporation organized for the purpose of handling labor problems and associated matters on behalf of its members, all of whom are salmon canners.

Being still unable to arrive at any agreement, the Union forwarded a letter to the Employers about the first of April, withdrawing its last proposed 1940 agreement, and stating that all further negotiations were being transferred to Seattle, where its representatives would meet, and did meet, with the Employers' agents. This move was welcomed by the Employers, who hoped to negotiate a coastwise agreement which would govern all Alaska operations and thereby put the San Francisco operators and employees on a parity with the Seattle and Portland operators and employees.

Thereafter, negotiations were resumed between the parties at Seattle. There negotiations with the San Francisco unions being about to fail, last minute attempts were made by both parties to come to an understanding, the Union proposing a renewal of their "1939 San Francisco agreement," while the Employers proposed the acceptance by the Union of the so-called "1939 Seattle agreement." Eventually a new agreement was negotiated at Seattle between the Seattle and Portland operators and unions, but this occurred later and did not include the San Francisco unions and operators.

Near the end of the negotiations at Seattle, the time growing near when an agreement must be made in order to make it possible for the operators to make the necessary preparations for operating their canneries in those districts, the San Francisco Employers notified the Union (Claimants) that if no binding contract was concluded by April 10th, regarding Karluk; or by April 12 regarding Chignik; or by May 3d regarding Bristol Bay, no operations could be undertaken at these plants during the 1940 season. No agreement was reached with reference to any of the plants referred to within the zero hour fixed by the Employers, with the result that none of the canneries were operated in any of the districts above specified during the 1940 season and the Claimants thus lost their employment for that season.

The Claimants contend that the decision of the Commission should be reversed, because:

1. Certain findings of facts made by the Commission are not supported by the evidence, viz:

The Commission found as a fact that "negotiations for a 1940 agreement were entered into between the parties (Employers and Union) and were in active progress at the opening of the canning season, as set forth in said Regulation No. 10."

2. The conclusions of law and decision are not supported by the findings of fact, viz:

The Commission concluded that "There was an 'active labor dispute' existing between the parties at the opening of the season."

3. The conclusions of law and decision are not supported by the evidence, viz:

The conclusion that there was a "labor dispute" is not supported by the evidence.

4. The findings of fact made by the Commission compelled a decision contrary to the one rendered; and

5. The evidence and a proper consideration of the case requires findings of facts on matters which the Commission ignored.

All of these contentions involve, in their final analysis, the interpretation of § 5(d) (as amended) of our Unemployment Compensation Act; and the determination of the larger questions of (1) What is a "labor dispute," and (2) whether such labor dispute was "in active progress" at the factory, establishment or other premises where he is or was last employed; and it is to these larger questions that we shall address our principal attention.

Unfortunately the words "labor dispute" on which this controversy hinges, are not defined in the Alaska Unemployment Compensation Act, and we must therefore endeavor to determine what the legislature meant when those words were used. The legislature being supposed to have used such words in their common and accepted meaning, it remains for us to determine what that meaning is.

"Dispute" is defined in Webster's New International Dictionary as: "To contend in argument; to argue something maintained by another; to debate; often to argue irritably; wrangle; to make a subject of disputation; to argue pro and con; to debate; to oppose by argument or assertion; to attempt to overthrow; controvert; to call in question; to deny the truth or validity of."

In Federal legislation the term "labor dispute" has been defined in two acts of the Congress. In the Norris-LaGuar-

dia Act, U.S.C.A. Title 29, subsec. (c) of § 113, the term is defined as follows: "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

In the National Labor Relations Act, U.S.C.A. Title 29, subsec. (9) of § 152, the term is defined thus: "The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

Our own unemployment compensation act was enacted in pursuance of the policy of social legislation enacted by the Congress of the United States, and, as is well known, is operated in conformity with Federal legislation and, to some extent, under Federal restrictions. We are not bound by the definition of a labor dispute contained in the Federal statutes, but these definitions are at least persuasive of what should be the definition of such a dispute, and are not out of line with the general and common acceptation of the meaning of the term; and, as said by Judge Fox in Miners in General Group v. Hix, 123 W.Va. 637, 17 S.E.2d 810, 815:

"Until a better definition is found, or there is some substantial reason for a finding that our legislature had in mind a different meaning to be attached thereto, there would seem to be no impropriety in our accepting these existing definitions [In Norris-LaGuardia and Wagner Acts] in the determination of what was then meant."

The term "labor dispute" has also been defined by many of our courts of last resort, but we regard a review of these decisions as unnecessary, since they can be readily found in 24 Words and Phrases, Perm. Ed., p. 28, under that title.

■■ Very recent opinions of the courts of last resort in Ala., Ky. and Tenn. uniformly hold, under statutes similar in all material respects to our own, that: Unemployment caused by the expiration of a contract of employment, and by the inability of the parties to agree on the terms of a new contract, is "due to a labor dispute" within the meaning of their statutes; and persons so unemployed are ineligible. for benefits. Department of Ind. Rel. v. Pesnell, 29 Ala. App. 528, 199 So. 720–724; Barnes v. Hall, 285 Ky. 160, 146 S.W.2d 929; Block Coal & Coke Co. v. United Mine Workers of America, 177 Tenn. 247, 148 S.W.2d 364, 149 S.W.2d 469.

There is, therefore, no question but what the negotiations between the parties, involving as they did, wages, hours and terms of employment, did constitute a "labor dispute" as that term is used in our statute.

We next turn to the determination of whether or not such labor dispute was " 'in active progress' at the factory, establishment or other premises at which he is or was last employed."

Concerning this the Commission found that "There was an active labor dispute existing between said parties at the opening of the season at all of the canneries in question, that said labor dispute continued," and that the Claimants were entitled to receive, if otherwise eligible, unemployment insurance as follows: "At Karluk Cannery eight (8) weeks after April 5; at Chignik Cannery eight (8) weeks after April 1; and at the Bristol Bay Cannery eight (8) weeks after May 5; said eight weeks disqualifying period being in addition to the two weeks regular waiting period, and if otherwise eligible."

It is admitted by the record that the dates of operation of the canneries in the districts involved in this controversy as fixed by Regulation No. 10 are as follows:

At Chignik, from April 1st to September 10th;
At Karluk from April 5 to September 25, and

At Bristol Bay from May 5 to Aug. 25;
and that the negotiations were not called off as to Chignik until April 12, as to Karluk until April 10, and as to Bristol Bay until May 3d.

It thus appears by the record and the admissions of all the parties hereto, that such "labor dispute" was "in active progress" at Chignik until twelve days after the season began; at Karluk until April 10th—five days after the opening of the season there; and at Bristol Bay at least until May 3d, with the season officially opening there on May 5.

 It also appears from the testimony taken before the Referee, (and is a fact so well known to both the Employers and Claimants, and to their representatives, and to the public generally, that the Court may well take judicial notice thereof), that even after an agreement has been reached, preliminary to the operation of such canneries, it is necessary for the Employers to purchase, pack, assemble and load onto their boats, food, medical and all other supplies for an entire season, and to transport such supplies and their working crews (the Claimants) from San Francisco to their canneries, a distance of from two to three thousand miles, and requiring ten to fifteen days to make the trip alone, without calculating the time necessary for preparation for such trip and the time for unloading their crews and supplies at their destinations, putting their canneries into shape for operation and preparing generally for the season's work.

It should also be borne in mind that the work at these canneries is seasonal work of comparatively short duration, and that in order to operate said canneries it was necessary for the Employers to reach an agreement with the Claimants within a time sufficient to permit the necessary preparations for the season's work and such operations on a reasonable basis. This also was well known to both the Employers and the Claimants.

That there was a constantly recurring and open controversy between the Employers and the Claimants as to

wages, etc., and that this "labor dispute" was the cause of the failure of the canneries to operate and the consequent unemployment of the Claimants, is thoroughly established by the evidence taken before the Referee.

It is immaterial to this discussion and to the findings in this case as to who was responsible for the failure to agree upon a 1940 contract between the parties that caused Claimants' unemployment. The reason for the failure to operate the canneries and the consequent unemployment of the Claimants was because the parties could not agree upon the terms of a contract for the 1940 season. It is not important as to why they failed to agree or whose fault it was, or whether one party or the other was to blame. The only thing of importance is the ultimate fact that they did not agree and that their failure to agree caused the unemployment of the Claimants, which is the basis of their claim.

Our statute makes no attempt to fix the responsibility for such stoppage of work, nor can we. The statute merely provides that no benefits may be paid thereunder where the "Commission finds that his total or partial unemployment is due to a labor dispute which is in active progress at the factory, establishment or other premises at which he is or was last employed."

Courts cannot legislate into statutes by interpretation, a meaning which the legislature itself was unwilling to sponsor or has purposely repudiated. Here the record shows that the reason for adding the proviso to § 5(d) "provided, that such disqualification shall not exceed the 8 weeks immediately following the beginning of such dispute," was to give the beneficiaries of the statute eight weeks in which to settle their "labor dispute," and to deny them the benefits of unemployment compensation during such period. As was said by Justice Carter, in speaking for the Court in Deshler Broom Factory v. Kinney, 140 Neb. 889, 2 N.W.2d 332, 336, in interpreting the Nebraska statute—which is substantially identical with our own:

"The Unemployment Compensation Law does not purport to grant benefits to workmen who leave their work voluntarily, neither does it intend for an employee to benefit from the act while his bargaining agents are attempting to adjust their differences with the employer, since voluntary idleness under such conditions is not 'unemployment'."

■ It thus appears that there was an "active labor dispute" existing between the parties hereto at the opening of the season. That no agreement was made for the 1940 season, as a result of which the canneries in question did not operate and the Claimants were thereby deprived of employment.

The Claimants also contend that the Alaska Salmon Company abandoned its 1940 Bristol Bay operations on April 30, 1940, and would not have operated during 1940, irrespective of whether there had or had not been an agreement with the Union. This contention was considered by the Referee and found without merit, and we concur in his finding.

■ They also contend that there was no Employer-Employee relationship existing between the parties at the beginning of the 1940 season. It is, however, agreed that such relationship had existed between the parties in the previous seasons, which would bring them within the provision of our statute denying compensation to those whose "total or partial unemployment is due to a labor dispute which is in active progress at the factory, establishment or other premises *at which he is or was last employed."*

An employer-employee relationship is not necessary for the imposition of the disqualification, since the statute is broad enough to cover not only one presently in an employer-employee relationship, but also one who has last been in such relationship, although that relationship may have expired. Block Coal & Coke Co. v. United Mine Workers of America, 177 Tenn. 247, 148 S.W.2d 364, 149 S.W.2d 469; March 8, 1941, Department of Industrial Relations v. Pesnell, 29 Ala.App. 528, 199 So. 720; Ex parte Pesnell,

252

240 Ala. 457, 199 So. 726; Barnes et al. v. Hall, 285 Ky. 160, 146 S.W.2d 929.

Other courts of last resort have so construed similar statutes.

 They further contend that an "active labor dispute" means a strike and picket line, an operation which is interrupted by such dispute, but such is not the law, and no authorities are cited in support of this proposition, although many authorities could be cited to the contrary.

 It is also urged that unemployment laws are remedial in nature, and as such are to be liberally construed. With this we agree, but in this connection we call attention to the declaration of the Territorial public policy set forth in the preamble to the Act itself, in these words:

*"Declaration of Territorial Public Policy.* As a guide to the interpretation and application of this Act, the public policy of this Territory is declared to be as follows: ·

"Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this Territory. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the Legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the employed worker and his family. * * * The Legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this Territory, require the enactment of this measure, under the police power of the Territory, for the compulsory setting aside of unemployment reserves to be used for the benefit of *persons unemployed through no fault of their own."*

The purpose of our Unemployment Compensation Act as thus expressed was "to provide economic security for the benefit of persons unemployed *through no fault of their own* and we think the statute should be construed in keeping with its declared policy, and while yielding to the view

that the statute should be liberally construed we think that it should be liberally construed in consonance with its expressed purpose.

Other minor questions are raised by the Claimants in their petition for review, but most of them are fully answered in the discussion of the larger questions involved, and such as remain are not considered of sufficient importance to merit discussion.

The conclusions herein announced find support in: Latham v. State Unemployment Comp. Comm., 167 Or. 371, 117 P.2d 971; Barnes v. Hall, 285 Ky. 160, 146 S.W.2d 929; Miners in General Group v. Hix, W.Va., 17 S.E.2d 810; Department of Industrial Relations v. Pesnell, 29 Ala. App. 528, 199 So. 720; Ex parte Pesnell, 240 Ala. 457, 199 So. 726; Block Coal & Coke Co. v. United Mine Workers, 177 Tenn. 247, 148 S.W.2d 364, 149 S.W.2d 469; Deshler Broom Factory v. Kinney, 140 Neb. 889, 2 N.W.2d 332.

A review of these cases might be interesting, but this opinion has already reached unexpected length. We therefore only add that we are aware of no courts of last resort (nor have any such cases been cited) which have reached a conclusion at variance with the views herein expressed, and our information and research both indicate that a large majority of the State Commissions have reached the same conclusions with respect to similar unemployment for which compensation was sought under statutes similar, or differing only slightly from our own.

The Findings of the Unemployment Commission are therefore affirmed.

Findings and judgment may be prepared in accordance herewith.