199 So. 720

## DEPARTMENT OF INDUSTRIAL RELATIONS v. PESNELL.

### 6 Div. 615.

Court of Appeals of Alabama.
Aug. 6, 1940.

Rehearing Denied Oct. 29, 1940.

530

Lange, Simpson, Brantley & Robinson, of Birmingham, Frank R. Broadway and J. Eugene Foster, both of Montgomery, and James A. Simpson, of Birmingham, for appellant.

Hugh A. Locke and Yelverton Cowherd, both of Birmingham, for appellee.

BRICKEN, Presiding Judge.

At the time this appeal was submitted in this court, it was extensively argued by respective counsel for the better part of two days. We were there informed, and the record bears out the statement, that the controlling question in this case is whether the appellee's unemployment was directly due to a "labor dispute" as that term is used in Section 6(d) of the Alabama Unemployment Compensation Law, Acts 1935, pages 950, 958, which reads as follows: "Section 6. * * * (d) During Trade Disputes. An employee shall not be eligible for benefits for any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed."

The record consisting of several hundred pages, and likewise voluminous and excellent briefs of the respective counsel, have been read with care and have been accorded attentive consideration. While much evidence was taken to establish the facts, we find that the controlling facts very clearly appear. They may be summarized as follows:

The United Mine Workers of America is a national labor organization. For administrative purposes it has divided the coal mining territories in the United States

into several districts. The Alabama territory is known as District No. 20. Within each district are Local Unions; The Locals report to the District Office and the District Office reports to the National Office. The District Office of District No. 20 is located in Birmingham, Alabama. The National Office is located without the State of Alabama.

The appellee was a member of a Local Union of the United Mine Workers of America at Edgewater Mines in District No. 20. He had designated in writing, and filed with his employer, the National Organization and John L. Lewis, its President, Phillip Murray, its Vice-President, Thomas Kennedy, its Secretary and Treasurer, and William Mitch, President of District No. 20, as his bargaining agents.

There is a territory in the Northeastern part of the United States known to the coal industry as the Appalachian Area. The area is the basic area in relation to whose wages, hours and working conditions the wages, hours and working conditions of all other coal mine workers affiliated with the national organization are set. The territory without the Appalachian area is referred to as "outlying territory." The operators in the Appalachian area and the United Mine Workers of America, in their Appalachian agreement, insert a clause that no other operators elsewhere will receive better terms than the United Mine Workers of America gives the Appalachian operators.

The contract between the United Mine Workers and the operators in the bituminous coal fields relating to wages, hours and working conditions, usually covers a two year period and expires on March 31, of alternate years. When this agreement expires on March 31st, of the alternate years, unless a new agreement has been negotiated in the meantime, the miners affiliated with the United Mine Workers cease work until a new contract has been negotiated. In 1939 there was a cessation of work from March 31st to May 19th, while a new agreement was being negotiated.

The appellee was employed by the Tennessee Coal, Iron & Railroad Company at its Edgewater Mines. The entire output of the Edgewater Mines is used by the company in its own business. In anticipation of the miners affiliated with the United Mine Workers of America ceasing work on March 31, 1939, the expiration date of the existing contract, and in order to keep its iron and steel making operations in progress, the Tennessee Company accumulated reserves of coal and coke. As the expiration date of the 1937–39 contract approached, the question of arriving at a new contract arose. Appellee's bargaining agent, John L. Lewis, by letter dated February 7, 1939, to all members of the National Policy Committee, which included Mr. Mitch as President of District No. 20, authorized the officers of the so-called "outlying districts," which included District No. 20, to negotiate agreements with coal operators in those respective districts for a continuation of work pending the negotiations in the basic Appalachian area. It was provided in said letter, however, that all agreements for continuation of work, pending negotiations, should contain the following stipulations:

"(1) All operators and groups of operators agree to accept and apply in their respective districts, any improved or advantageous arrangement agreed to in the basic Appalachian joint wage agreement affecting wages, hours or conditions of employment, and to make such improvements effective as of the same date that they become effective in the Appalachian agreement."

"(3) That all extended agreements negotiated by any district shall include the following stipulation: 'This agreement may be terminated at will by fifteen days formal notice from either party thereto.'"

When it became evident and apparent to all parties that the Tennessee Coal, Iron & Railroad Company would not sign a work-pending agreement containing the two provisions quoted, and that the members of the United Mine Workers of America would not work after March 31, 1939, unless a work-pending agreement was executed, until a new agreement for the Appalachian area was reached, the Tennessee Coal, Iron & Railroad Company posted a written notice at its Edgewater Mines, reading as follows:

"Tennessee Coal, Iron and
Railroad Company
"Notice

"To employees of Edgewater Mines

"Effective Saturday, April 1, 1939, operations at this mine, with the exception of necessary repair, maintenance and construction work, will be suspended for a period of two weeks, or until April 17, 1939.

"The Company will continue, until further notice to voluntarily pay to its Coal Mine employees to whom it is or becomes indebted the present rates of pay.

 "(Signed) W. M. Lacey
 "Superintendent
"Approved: R. E. Kirk (Signed)
 "General Superintendent
"3–31–39."

And from time to time during negotiations for a new agreement for the Appalachian area, similar notices were posted at Edgewater.

On February 10, 1939, Mr. Mitch, the President of District No. 20, wrote the employer, informing the employer of his authority under the letter of February 7, 1939, and on February 16, the employer informed Mr. Mitch that it was not willing to agree in advance to provisions that might be incorporated in the agreement for the Appalachian area, without knowing what the terms thereof might be. This letter contained a counter-proposal, which was not acceptable to Mr. Mitch. A conference between the United Mine Workers of America and the coal operators in the Appalachian area met on March 14th, where certain proposals were submitted by Mr. Phillip Murray, one of appellee's bargaining agents.

The operators submitted some proposed changes in the contract about to expire. The matter was discussed for several days and the upshot of it was that prior to the date of the expiration of the then existing contract, the conference definitely turned down the proposals by the United Mine Workers of America. The proposal of the coal operators was also voted down prior to the expiration date of the then existing contract, which, as stated, was March 31, 1939.

Because of a failure to reach a new contract by midnight March 31, 1939, all bituminous coal mining in the Appalachian area ceased at that time. The Alabama operators having refused to sign a work-pending agreement, coal mining also ceased in Alabama at midnight on March 31, 1939.

During the negotiations for a new contract with the Appalachian area, the operators offered to extend the expiring contract for a period of two years, without change. That was rejected by the United Mine Workers, which in turn proposed to renew the expiring contract for a period of two years with a Union Shop Clause attached, which was declined by the operators. The inability to agree continued until about the 9th day of May, 1939, when the President of the United States invited the committee appointed for the conference to handle the matter, to Washington, where it was insisted that the operators and miners must get together on a contract. The committee made a report about May 12, which was accepted by the Appalachian General Conference, with the exception of five associations, which withdrew from the conference. The new agreement relating to the Appalachian area was signed May 13, 1939.

It is very clear that all parties thoroughly understood the position of the United Mine Workers was that work would cease in Alabama on the night of March 31st, unless a new contract with the Appalachian area was reached by that date, or a work-pending agreement containing the provisions above referred to was entered into by the operators and District No. 20.

It would serve no good purpose, and would extend this opinion to an unreasonable length, to set out all of the proposals and counter-proposals of the United Mine Workers and the coal operators in their discussion about a new agreement for the Appalachian area. There is no mistake, or uncertainty, about the position of the United Mine Workers of America and District No. 20. It was as stated above.

When a basic agreement was reached in the Appalachian area, the Tennessee Coal, Iron & Railroad Company met with representatives of the appellee, and adapted such basic agreements to conditions in District No. 20, and executed a contract for work here, which contract was completed on May 19, 1939. On the execution of this contract all of the employees of the Tennessee Coal, Iron & Railroad Company, affiliated with the Union, including the appellee, returned to work at once.

The evidence in this case makes it quite clear that the employees of the Tennessee Coal, Iron & Railroad Company, affiliated with the Union, would not work after March 31, 1939, until a new agreement for the Appalachian area had been consummated, unless the employer would execute a work-pending agreement containing the stipulation set out above.

It is further clear from the testimony that bargaining agents of the appellee were insisting upon provisions in the new agreement for the Appalachian area that were

not acceptable to the operators, and that the operators were tendering proposals that were not acceptable to the Union.

It further appears that the differences were so marked that intervention of the President of the United States was necessary, in the public interest, to prevent a further deadlock.

The trial court took the position that the Tennessee Coal, Iron & Railroad Company voluntarily closed its mines at Edgewater, at a time and place where there was no labor dispute existing between the Company and its employees, and that it voluntarily continued to keep its mines closed until May 19, 1939; that the shut-down was caused for the purpose of the Company making repairs and maintenance and reduction in its reserve of coal and coke, and for the lack of a definite contract between the United Mine Workers of America and the Company. The trial court also took the view that had the shut-down of said mines been solely caused by lack of a contract and pending negotiations of a new contract, where the negotiations were carried on in a businesslike, friendly and fair manner, that it would not of itself constitute a labor dispute as provided in Section 6(d) of the Unemployment Compensation Act.

A judgment was rendered in favor of the plaintiff and against the defendant, and the case is here for a review of that ruling.

We are not in accord with the trial court on the facts or the law. It is clear from this record that the mines at Edgewater would have operated had the Union not insisted on a contract or the stipulations quoted in a work-pending agreement binding the operator to accept certain provisions in any agreement reached for the Appalachian area. The operator would not accept that and the men could not work. The Union would not make a contract for District No. 20 until an agreement for the Appalachian area was reached, except the work-pending agreement referred to.

 This record shows that the stoppage of work giving rise to the claim for unemployment benefits was due to a labor dispute. The legislature, in our opinion, never intended for a member of a Union to draw unemployment benefits, while his bargaining agents are discussing the terms of a proposed contract, where the Union itself has ordered work to cease until its terms are met. That is not our conception of unemployment. Voluntary idleness during discussion, by appellee's agents, of a proposed contract, can hardly be termed unemployment. Negotiation may itself be a form of dispute. The Union's position that its membership shall not work without a contract, and the employer's position of declining to enter into a contract that would obligate it to unknown and unforeseeable provisions in another contract to be agreed upon, was in itself a dispute about terms and conditions of work—a labor dispute. It was the Union, not the employer, who refused to mine coal without a new contract. The Union could take that position under the law, but its right to take that position did not prevent the controversy from being a labor dispute. The appellee's situation was created by his duly selected bargaining agents. Their acts were his acts. It would be difficult for us to reach the conclusion that the appellee could, under the law, bring about a cessation of work and then claim he was unemployed within the terms of the Unemployment Insurance Act. The naked fact is, appellee quit work during the time his agents were discussing the terms of a proposed contract with the management. The terms were a matter of controversy. Appellee was out of work because he was a party to a controversy over wages, hours and conditions of labor. That is a labor dispute.

A labor dispute is defined in the Norris-LaGuardia Labor Disputes Anti-Injunction Act, Title 29 U.S.C.A. § 113, as follows: " (c) The term 'labor dispute' *includes any controversy concerning terms or conditions of employment,* or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless* of whether or not the disputants stand in the proximate relation of employer and employee."

The National Labor Relations Act (the so-called Wagner Act), enacted July 5, 1935, defines Labor Dispute as follows, Title 29 U.S.C.A. § 152(9) : " (9) The term 'labor dispute' *includes any controversy concerning terms, tenure or conditions of employment,* or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

As stated, we see no escape from the conclusion that appellee ceased work be-

534

cause of a controversy concerning terms or conditions of employment. The appellant's brief contains a complete list, compiled, we are informed, from Words and Phrases, Permanent Edition, of every decision by an appellate court construing the term "Labor Dispute". Said list of cases appears in the report of this case.

The rulings of the trial court were not in accordance with the views expressed. The judgment appealed from is reversed and a judgment here rendered for appellant.

Reversed and rendered.