No. 15,060.

SANDOVAL ET AL. *v.* INDUSTRIAL COMMISSION ET AL.

No. 15,061.

MONTGOMERY ET AL. *v.* INDUSTRIAL COMMISSION ET AL.

No. 15,062.

AHOE ET AL. *v.* INDUSTRIAL COMMISSION ET AL.

No. 15,063.

MONKS ET AL. *v.* INDUSTRIAL COMMISSION ET AL.

No. 15,064.

LEWIS ET AL. *v.* INDUSTRIAL COMMISSION ET AL.

No. 15,065.

BANZANELE ET AL. *v.* INDUSTRIAL COMMISSION ET AL.
(130 P. [2d] 930)

Decided November 2, 1942.

Mr. PHILIP HORNBEIN, Mr. PHILIP HORNBEIN, JR., for plaintiffs in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. HENRY E. ZARLENGO, Assistant, for the Industrial Commission and Bear Canon Coal Company, defendants in error.

Messrs. LEWIS & GRANT, Mr. STEPHEN H. HART, for Huerfano Coal Company and Keystone Coal Company, defendants in error.

Messrs. DINES, DINES & HOLM, Mr. ROBERT E. MORE, for Colorado-Utah Coal Company and Moffat Coal Company, defendants in error.

Messrs. YEAMAN, GOVE & HUFFMAN, Mr. FRANK J. TRELEASE, JR., Mr. S. A. SUTLIFF, for Victor-American Fuel Company, defendant in error.

*En Banc.*

MR. CHIEF JUSTICE YOUNG delivered the opinion of the court.

FOR the purposes of this review, six cases have been consolidated by agreement of the parties. Our examination of the records convinces us that they are all controlled by the same general propositions of law and that they may be disposed of by one opinion.

The employees of the coal mining companies made application for unemployment benefits under the Colorado Employment Security Act, chapter 167A, '41 Supp. '35 C.S.A. For convenience, reference will be made to employee claimants as claimants, or the men, and to the employer companies as operators.

The unemployment involved in the litigation arose out of the following situation: The United Mine Workers of America as the bargaining agency for the men, and the various coal companies, parties hereto, on April 1, 1939, entered into contracts as to wages, hours and working conditions, which expired March 31, 1941. Prior to their expiration, there were negotiations between the parties for new contracts. Due to the fact that there was an understanding between the men and the Colorado operators that the new contracts would fix wages, hours, and working conditions by the application of a certain proportionate scale to the agreement by the United Mine Workers of America and the Appalachian coal operators, and to the further fact that this so-called Appalachian agreement, although negotiations were pending, had not been consummated, it was not possible on April 1, 1941, to determine what the new Colorado contracts would provide. The men, through the United Mine Workers of America as their bargaining agency, demanded that they be given the benefits of the new contracts when entered into, retroactive to April 1, 1941. The operators refused this demand, but offered to renew the expired contract for two years. The men declined to accept this offer; were unwilling to work without a contract; and the resulting unemployment is the basis of their claim.

The finding and decision of the Industrial Commission on the claim for compensation made by the men so un-

employed, was as follows: "The Commission therefore finds: That the cessation of work in the bituminous coal industry in the State of Colorado existing on April 2, 1941, constitutes a bona-fide labor dispute, and all claimants whose total or partial unemployment is due to this strike are ineligible for benefits under Section 5 (d) of the Colorado Employment Security Act."

Claimants subsequently instituted appropriate actions in the district court asking, "that the decision of the commission be set aside and that the court enter such order and judgment as the law requires." Upon due hearing judgments were rendered in favor of the commission and against claimants, to reverse which the latter have sued out writs of error.

There is evidence in some of the records tending to show that some of the operators of the mines did not work their properties following the termination of the agreements because they had no present demand for coal, but apparently the commission was not impressed by this evidence and the necessary implication from its decision is that on this point it did not deem the contention sustained by the evidence. It appears clearly from the records that the bargaining agency, the United Mine Workers of America, would not permit the men to continue work even during the interim, without a new contract.

It will be observed that the commission in rendering its decision, used, apparently as of interchangeable significance, the words "labor dispute" and "strike." It will be further observed that it found that the unemployment following the cessation of work "due to this strike," was not compensable, and that claimants for this reason were barred from benefits under section 5 (d) of the Colorado Employment Security Act. This section makes unemployment due to a strike noncompensable.

We think it clear that the proper construction to be placed upon the commission's finding is that it found the unemployment was due to a strike, rather than to

a labor dispute which is the broader term, and conceivably may exist without a strike. We are the more persuaded to this view of the decision because the commission found facts which are hereinafter recited as a basis for its decision from which the conclusion that a strike existed follows; furthermore, the last specific finding preceding the decision is "that the cessation of work commencing on April 1, 1941, was caused by a strike."

The point specified as ground for reversal, which we consider raises the only issue in the case, is whether the decision of the commission is supported by the evidence. If so, the unemployment is noncompensable; if not, it is compensable.

Counsel for claimants rely strongly on the case of *United States Coal Co. v. Unemployment Compensation Board of Review*, 66 O. App. 329, 32 N.E. (2d) 763. The Ohio statute is similar to our Colorado law, in that compensation is not payable if the unemployment is due to a strike. The case is authority for claimants' contention, but the opinion is based, as we think, on the fallacious assumption that in the absence of a contractual obligation to work, and to employ, for contractually specified wages and hours and under contractually specified conditions, there can be no strike. That such was the court's view is indicated by the following excerpt from the opinion:

"We find this definition of 'strike' in Baldwin's Century Edition of Bouvier's Law Dictionary, to wit:

" 'A combined effort by workmen, to obtain higher wages or other concessions from their employer by stopping work at a preconcerted time.'

"The facts in the instant case do not bring the acts of these employees within this definition, which definition we regard as excellent. Here, there was no combined effort to stop work at a preconcerted time. There was simply a conference attempting to work out an agreement between the interested parties.

"The only contract existing between them had ended.

No duty rested upon either the operators or the miners. The operators were under no obligation to keep the mines open. The miners were under no obligation to work. There was no contractual obligation."

██ The definition of a strike as given in Restatement of the Law—Torts, section 797, quoted by claimants in their brief, is as follows: "A strike is a concerted refusal by employees to do any work for their employer, or to work at their customary rate of speed, until the object of the strike is attained, that is, until the employer grants the concession demanded. * * * "

This definition emphasizes as the essential of a strike the concerted refusal of employees to work for their employer, rather than the concerted cessation of work. It is more comprehensive than the definition quoted in the Ohio Court's opinion, and we think is applicable to the present situation. While there may have been no preconcert in the cessation of work, the record before us does disclose a concerted refusal to work in the interim pending the consummation of the Appalachian agreement until certain concessions during such interim were obtained.

We are not persuaded by the reasoning of the Ohio Court of the correctness of its decision.

The Utah case of *Employees of Utah Fuel Co. v. Industrial Commission,* 99 Utah 88, 104 P. (2d) 197, under a statute similar to ours, is relied upon by counsel for the operators as direct authority supporting their contention that there was a strike in the instant case. We do not so construe it. It is not necessarily inconsistent with the Ohio case, supra, for in the Utah situation an interim contract pending the consummation of the Appalachian agreement was entered into, and on notice as therein provided, the men stopped work "at a preconcerted time." It throws little light on the problem here presented.

The following cases were decided under statutes that require only the existence of a labor dispute to prevent

the unemployment occasioned thereby from being compensable: *Department of Industrial Relations v. Pesnell,* 29 Ala. App. 528, 199 So. 720; *Block Coal & Coke Co. v. United Mine Workers of America,* 177 Tenn. 247, 148 S.W. (2d) 364; *Barnes v. Hall,* 285 Ky. 160, 146 S.W. (2d) 929; *Dallas Fuel Co. v. Horne,* 230 Ia. 1148, 300 N.W. 303. Whether under the facts presented in these cases the respective courts would have found that a strike existed we are, of course, unable to determine. It was not necessary so to find under the applicable statutes and they did not do so. These cases are not direct authority for adopting the contention of either of the parties to the present litigation. The Dallas Fuel Company case, save for the fact that it is under a statute that requires only a labor dispute to make the unemployment noncompensable, is almost identical with the Utah case. It holds, as against claimants' contrary contention, that the cancellation of an interim contract and refusal to work do constitute a labor dispute. It was not necessary under the statute to determine whether it constituted a strike, and of course, the court did not do so.

The unemployment benefit plan as adopted in Colorado, was designed to accomplish a specific objective; namely, to lighten the burdens that fall upon the victims and their families as a result of involuntary unemployment. Section 2, chapter 167A of the Colorado Employment Security Act is declared to be a guide to the interpretation and application of the act, and a statement of its underlying policy. The following findings and declarations are therein made by the General Assembly: "Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker

and his family. The achievement of social security requires protection against this greatest hazard of our economic life."

It will be noted that the hazard arises, in the mind of the General Assembly, when involuntary unemployment occurs. It was the thought of the General Assembly, as we conceive, that involuntary unemployment might be prevented in two ways: first, by encouraging employers to provide more stable employment, and, second, by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment. The result of the latter, it is declared, will be to maintain purchasing power and limit the consequences of poor-relief assistance.

On the findings and conclusions to which we have just referred, the General Assembly finds that the general welfare of the citizens of the state requires that the state, in the exercise of its police power, should compel the setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own. If employers provide stable employment, purchasing power will be maintained and a minimum of poor-relief assistance will be necessary. If employers cannot provide employment, or do not do so, then purchasing power is to be maintained artificially and the need for poor-relief assistance minimized by an artificial method, by paying stored up reserves in the form of unemployment benefits.

■ The whole act should be construed in the light of the foregoing legislative declaration of policy. Paragraph (d), section 5 of the act, is as follows:

"§5. An individual shall be disqualified for benefits—
* * *

"(d) For any week with respect to which the commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a strike at the factory, establishment, or other premises at which he is or was last employed: * * *"

Having in mind the declared policy of the General Assembly, Is not a strike, in so far as the application of the act is concerned, a concerted refusal to work for pay and under conditions that are presently available in order to procure more advantageous conditions or greater pay? In the instant cases employment at the old contract rate and under the old conditions was available. The employers were under no contract duty to offer more; on the other hand, the miners were under no contract obligations to work for the same wages and under the same conditions; but it was the employees who were seeking a change in the status quo and not the employers. The miners refused to work unless the status quo was modified.

The peculiarity of the situation here is, that a demand was made and refused for presently unascertained and unascertainable wage and working conditions. The demand was based on a future contingency, not on a presently existing situation. There was agreement that a contract would be entered into and the basis of that contract was agreed to when ascertained.

Contractually, on April first the men were not obligated to work if the operators offered work, nor were the operators obligated to offer work even though the men were willing to work. What then was their interim relationship, and how did it affect the application of the Colorado Employment Security Act to the actual unemployment to which it is sought by the men to be made applicable?

The operators say they could not produce coal at an unknown cost and safely continue their business operations; that they would be faced with a contingency that such sales would be at a loss. The men say, in effect, that they could not work faced with the contingency of insufficient money each payday to pay their expenses; in other words, if the mines operated on the unascertained new wage scale, the operators faced a contingent loss; if the men worked on the old scale, they faced a

contingent loss. Neither would accept the hazard involved in accepting the other's terms and no work was done. Clearly, there was a labor dispute as to whether the old or new schedule should apply in the interim. The operators had work to do and the men had services to dispose of, and unemployment was the result of the labor dispute.

Conceivably, a labor dispute may exist without a strike. A labor dispute that is accompanied by a concerted refusal to work for the employer until the dispute is resolved in favor of the men's contentions, furnishes all the elements of a strike. The definition of a labor dispute contained in the National Labor Relations Act which doubtless may be accepted as a proper definition of the term "labor dispute" where used in unemployment compensation acts, is as follows: "The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." (29 U.S.C.A., §125 [9]). This definition does not state that if an employer-employee relationship exists, as the record discloses did exist in the instant cases, and there is a labor dispute accompanied by a concerted refusal of such employees to work, that such a situation does not constitute a strike. It merely says that there may be a labor dispute regardless of whether there is any employer-employee relationship between the disputants. Lacking that relationship there could be no strike. In the instant cases this was not lacking, as we hereinafter more specifically point out.

A concerted refusal to work, or a concerted cessation of work in and of itself under such circumstances as are presented in this case, is but the exercise of a right and violates no contractual obligation the men owe to

the operators. A refusal to employ under such circumstances violates no contractual obligation the operators owe to the men. It is not necessary, however, that there be such contractual obligations in order that a strike exist. While the men were unemployed, expecting to return to work, and while the operators had closed their mines expecting, however to reopen them and re-employ the men, an *actual* employer-employee relationship did not exist; but neither was their relationship the same as that of men seeking employment from and negotiating for terms with operators between which and them an actual employer-employee relationship had never existed. As near as the relationship that did exist can be described, it was a suspended employer-employee relationship and recognized by both parties as such.

In the case of *Iron Molders' Union No. 125 v. Allis-Chalmers Co.* (C. C. A., 7th Cir.), 166 Fed. 45, 52, 20 L.R.A. (N.S.), 315, the court said: "A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lock out is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms. Neither strike nor lock out completely terminates, when this is its purpose, the relationship between the parties. The employees who remain to take part in the strike or weather the lock out do so that they may be ready to go to work again on terms to which they shall agree— the employer remaining ready to take them back on terms to which he shall agree. Manifestly, then, pending a strike or a lock out, and as to those who have not finally and in good faith abandoned it, a relationship exists between employer and employee that is neither that of the general relation of employer and employee, nor again that of employer looking among strangers for employees, or employees seeking from strangers employment." Such a suspended employer-employee relationship is an essential ingredient of a strike, for if an actual employee-employer relationship never existed, or

if the refusal to work by the men is with the intention never to be re-employed by the employer, it is not a strike, and if the plant shuts down with the intention never to re-employ the men, or men of the same class, to operate the business, it is not a lock out.

A strike possesses at least four ingredients other than the suspended employer-employee relationship which has been mentioned, namely: (1) A demand for some concession, generally for a modification of conditions of labor or rates of pay; (2) a refusal to work, with intent to bring about compliance with the demand; (3) an intention to return to work when compliance is accomplished; and (4) an intention on the part of the operator to re-employ the same men or men of a similar class when the demands are acceded to or withdrawn, or otherwise adjusted.

In the instant case, on April first, there was a suspended employer-employee relationship between the men and the operators; there was a dispute between them as to whether the men, if they continued working during the interim pending the Appalachian agreement, should receive pay at the rate provided in the expired contract or at the unknown rate to be fixed by the Appalachian agreement. The commission found that the operators were willing to operate during the interim under the terms of the expired contract and that the men insisted on the working conditions and pay of the as yet unconsummated Appalachian agreement as applicable to Colorado. The men demanded an interim modification of previously negotiated existing conditions as a prerequisite to their return to work. The operators refused their demand and the employees did not work. The operators were willing to enter into a new contract on the same terms; they sought no change in the status quo. If there had been no dispute over wages, hours and conditions of labor, there would have been no cessation of work. That the men's refusal to work was to compel compliance with their demand, is evident from the fact

that where it was met they returned to work, and where it was not met, they refused to work.

The commission found that there was (1) a demand for a modification of existing conditions of work or scale of pay, or both; (2) a cessation of work and a refusal to work, and (3) an intent not to work until there was a compliance with the demand. There is evidence in the record to sustain its findings. The act vests in the commission the power to determine in the first instance that a strike does or does not exist. Having found from evidence facts constituting the elements of a strike, we cannot say it was in error in finding that the men were unemployed due to a strike and hence not entitled to unemployment compensation, or that the district court was in error in upholding such finding.

The men's bargaining agency, which the operators recognized and accepted, had not succeeded in effecting a new, so-called Appalachian agreement, which all these records disclose would have ended the difficulties that arose in Colorado due to the termination of the Colorado contracts prior to its consummation. The Colorado operators, the records disclose, were not represented in the Appalachian conference and can be charged with no dereliction or delaying tactics in consummating the Appalachian agreement, nor does it appear other than by insinuation that the refusal to work in Colorado was to compel the Appalachian operators to yield in the pending negotiations.

The undisputed evidence is that Hefferley, Colorado representative of the United Mine Workers, stated in the joint meeting, that the miners could not then enter into a contract, for the controlling factors in the Colorado contracts had not been ascertained. The men refused to work unless there was a compliance with their demand that the operators accede to unascertained conditions of work and rates of pay, and that the operators bind themselves to compliance therewith by an interim contract. In effect, they demanded that the

operators make an interim surrender of a certainty in computing the labor cost of production, for an uncertainty, and that if the Appalachian agreement raised the scale of wages, the men should receive the benefit and, conceivably, if the agreement lowered it that the men should have the interim benefit of the old scale, for the retroactive element in the proposal applied only to "any increase in wages or improvements in hours or conditions." Stated otherwise, the men's demand was for the interim unascertained benefits of the Appalachian agreement with freedom from any possible detriment, and that the operators assume all unascertained detriment to them without any possible unascertained benefits flowing to them in the interim.

The terms of the expired contract, the negotiations of March 22, and all prior dealings between the men and the operators, indicate an intended continuance after the expiration of the contract of the employer-employee relationship. The operators still wanted to employ the men and the men still wanted to work. During the interim the operators were willing to maintain the status quo and the men wanted to change it, but were not able to say how or to what extent, those matters being dependent upon future action in the Appalachian conference to which the men's bargaining agency, as shown by the testimony, was a party, but to which the Colorado operators were not parties.

We are of the opinion that the evidence in the record supports the finding of the commission that the interim refusal of the men to work unless guaranteed the contingent benefit of future action which was then unascertained and unascertainable, constituted a demand for a modification of working conditions and rates of pay and that their refusal to work until there was a compliance with such demand, did constitute a strike.

Judgment affirmed.

Mr. Justice Hilliard dissents. Mr. Justice Jackson did not participate.

Mr. Justice Burke.

I concur in both reasoning and conclusion, but would put affirmance on a broader basis. It seems to me this is a clear case of voluntary unemployment and that such is expressly excluded from compensation. Were it otherwise, I think the statute would be void. My conclusion is that whether unemployment results from a labor dispute or a strike, is immaterial. The only question is, was it voluntary or involuntary.

Mr. Justice Hilliard dissenting.

Because I was in Chicago serving as arbitrator for the Government in the Toledo, Peoria and Western Railroad controversy when these cases were orally argued, I had thought I would not participate in the decision. The points are so important, however, that I was moved to examine the records and briefs. As the result of that study I am in disagreement with the opinion of the court. I am not a little persuaded to that view by the dissenting opinion prepared by the late Justice Otto Bock. That the convictions of our late distinguished brother on the questions involved may not be lost to the learning on the subject, and which I am honored to adopt as my own, I quote his opinion, as follows:

"I regret my inability to concur. I believe that our approach to a determination of the issues involved in these cases should be the same as that adopted when we are called upon to construe or consider any other statutory provisions relating to compensation benefits. The legislative intent is to provide a measure of economic security for one while he is out of employment. The objective of the coal operators is to limit the purpose of this beneficial relief. In a determination of this issue we should give such a beneficial statute a liberal construction. Such has consistently been our attitude in construing the Workmen's Compensation Act, which, like the Colorado Employment Security Act, is grounded in

the industrial development of the state. It is unnecessary, in view of our numerous decisions laying down this rule of construction, to make reference to specific cases. The social implications of the act are of no concern to us.

"In its finding and decision the commission states: 'Clearly, the question before this Commission is solely one of determining whether a strike did exist on April 2, 1941, in the bituminous coal industry in the State of Colorado.' Whether, under the facts in this case, there was a strike within the meaning of section 5(3)(d), chapter 167A, 1941 Supp., '35 C.S.A., is, in the final analysis, a judicial question. Relative to those facts, the commission, in its findings, makes the following statement: 'It is recognized that the continuation of operations in the bituminous coal industry is governed by contract between the operators and workers. Upon the expiration of one contract, it is mutually understood that any further work will proceed or cease, according to a contract. Therefore, when the old contract expired on March 31, 1941, it was understood that operations between employer and worker alike should be suspended pending a new agreement.' This statement is predicated upon the evidence of the coal operators, representatives of which also testified that the Appalachian group fixes the basic wage of all other groups, and until that agreement is consummated, the coal operators and miners in Colorado could not conclude their agreement. This has been the practice for a number of years. The differentials in wages between the several groups affect the various trade areas which the parties seek to preserve in order not to distort existing competitive fields. A joint conference of all parties, as provided by section 26 of the agreement, was held March 23, 1941, with the result above indicated, viz., that no agreement could be consummated until the Appalachian wage scale was determined. As soon as this was determined the parties hereto consummated another agreement.

"The decision of the commission was, 'That the cessation of work in the bituminous coal industry in the State of Colorado existing on April 2, 1941, constitutes a bona fide labor dispute, and all claimants whose total or partial unemployment is due to this strike are ineligible for benefits under Section 5(d) of the Colorado Employment Security Act.'.

"In Restatement of the Law—Torts, page 140, section 797, a strike is defined as follows: 'A strike is a concerted refusal by employees to do any work for their employer, or to work at their customary rate of speed, until the object of the strike is attained, that is, until the employer grants the concession demanded.' This definition excludes the suspension of work by reason of a mutual understanding, as indicated by the statement of the commission quoted above. Since 1933, by common agreement, no contract would be negotiated until the Appalachian wage scale became fixed. The whole arrangement between the parties was contractual, including the obligation of the miners to supply men to take care of maintenance and repair of the mines during the cessation of general work and during negotiations of the new contract.

"The case of *United States Coal Co. v. Unemployment Compensation Board of Review*, 66 O. App. 329, 32 N.E. (2d) 763, involved a situation similar to the one here under consideration. There, in upholding the contention of the miners, the court said: 'In the absence of any contractual obligation, and in the absence of any duty on either side, and with knowledge on the part of both the operators and the miners, that their relationship would be decided by the results of this Appalachian Joint Conference, it seems to us to follow that there was no strike during that period of time on the part of these miners.'

"It is true that the coal operators offered to continue operations upon the same terms as those contained in the 1939 agreement, either for a period of two years or

until a satisfactory agreement could be reached in the Appalachian district. This, however, was simply in the course of a mere conversation and was on a par with the offer of the miners to continue operations, with the understanding that upon the fixing of the Appalachian basis the new contract would operate retroactively, beginning April 1, 1941. All parties knew from past experience that if the contractual basis between them was to continue, the Appalachian controversy must first be settled. Under these circumstances, the facts did not warrant the commission's determination that, owing to a strike, the claimants were disqualified from receiving insurance benefits under the Colorado Employment Security Act.

"It will be noted that the commission, in its decision above quoted, used the term 'labor dispute.' This designation is considerably more comprehensive than the term 'strike.' In all the cases, except one, cited in support of the contention of the operators, the disqualifying statutory provision relates to 'labor disputes.' If our statute were similar, it would not be difficult to sustain the operators' position. Under the facts and circumstances before us, there was, in my opinion, no strike within the meaning of section 5(3)(d), supra, which would disqualify claimants from collecting benefits under the act; consequently, I believe the judgment should be reversed."