155 So.2d 123

## DEPARTMENT OF INDUSTRIAL RELATIONS and Alabama Dry Dock Shipbuilding Company

v.

## Richard John HEADON.

**1 Div. 880.**

Court of Appeals of Alabama.

Oct. 23, 1962.

Rehearing Granted April 2, 1963.

Further Rehearing Denied April 23, 1963.

J. Eugene Foster and Wm. S. Mooneyham, Montgomery, for the Department of Industrial Relations.

C. B. Arendall, Jr., and W. C. Boone, Jr., Mobile, for the employer.

Vincent F. Kilborn, Mobile, for appellee.

JOHNSON, Judge.

This appeal is from a judgment of the Circuit Court of Mobile County awarding unemployment compensation to appellee, plaintiff below. In the administrative processes, prescribed by Code 1940, Title 26, § 215 et seq., pursued before the Department of Industrial Relations, the claim was denied. On appeal to the Circuit Court the trial was de novo, without a jury, and was submitted upon a transcript of the evidence

taken before the Board of Appeals of the Department of Industrial Relations and the decision of the Board, together with certain documents and newspaper articles and stipulations of the parties. From the judgment of the Circuit Court, the Department of Industrial Relations and plaintiff's employer, Alabama Dry Dock and Shipbuilding Company, have appealed. It is stipulated that plaintiff (appellee) is entitled to unemployment compensation unless disqualified under Sec. 214, Title 26, of the Code. The sole question presented to this court is whether appellee's unemployment was due to a labor dispute within that section.

The evidence is in pertinent substance as follows:

The employer, hereinafter called the Company, owns and operates a shipyard for shipbuilding and ship repairing, in or near Mobile. Appellee was on and prior to March 1, 1959, an employee of the Company as a pump man, and a member of Local 18 of the Industrial Union of Marine and Shipbuilding Workers of America, hereafter called the Union. For some years there had been in force bargaining agreements between the Company and the Union as bargaining agent for employees (with exception not here material) of the Company. Such a bargaining agreement had been entered into between the Company and the Union effective from March 2, 1957, to and including March 1, 1959. Among other things, this agreement provided that either party could, at any time between December 22, 1958, and January 1, 1959, give notice to the other party of its desire to negotiate for a uniform change in wage rates, effective March 2, 1959. If such notice was given, the parties would within thirty days after January 1, 1959, meet to negotiate for such change.

If the parties could not agree with respect to such matter by midnight of March 1, 1959, it was provided that either party could, notwithstanding a provision of the agreement against strike or lockout, resort to a strike or lockout in support of its position with respect to such rate change. Fur-

ther, it was provided that if an agreement was reached it would be incorporated in the current agreement and the agreement as modified should remain in force until March 1, 1960.

Timely notice was given by the Union to the Company of its decision to negotiate for a change in wage rates to be effective March 2, 1959, whereupon the parties set up negotiating committees. Though there had been a preliminary meeting, the parties did not get down to negotiation until the last two weeks before March 1, 1959, and up until that date the respective committees were still in dispute. There was no limitation on the time for negotiations, except that after March 1, 1959, the Union was released from its no-strike pledge.

On February 28, 1959, the Union held a membership meeting at which an especially large number was present. The members present unanimously voted to empower the Union's negotiating committee to call a strike whenever it thought it had reached a point where it could make no more progress.

Extracts from newspapers (introduced for the limited purpose) informed the public that the negotiations had failed to bring forth an agreement, that a strike vote had been taken, and that numbers of the Company's employees had been "furloughed". Actually no strike was ever put into effect, though a final agreement between Company and Union was not reached until March 6, 1959. Evidence was offered to show that when employees threaten to go on strike during labor negotiations, "the customary philosophy or knowledge in the trade" is that all vessels on which work is being performed in the plant or yard are considered "hot ships"; that is, if a vessel leaves the yard after a strike has been called and picket lines have been put up, it is considered a struck ship and no other union will work on that vessel. It further appears that beginning on the night of March 1, 1959, after the strike votes had been taken but before the strike had been put into effect, some half a dozen vessels in the Company's yard un-

dergoing or awaiting repairs withdrew from the yard; and that a like number of vessels tentatively scheduled for dry docking in the yard did not come into the yard during the week of March 1 to 7, 1959. During Monday, March 2, 1959, the Company re-evaluated the work left in the yard, determined what the remaining work was and what forces would be needed to perform the work, taking into account that in laying off or assigning work to employees the Company would be obliged to observe the rule of seniority. The appellee Headon had worked on the second shift February 28–March 1. He had no notice not to return to work and normally would have gone to work on the second shift on March 2. When he reported for work on that day, there was no card in the rack for him. Apparently all cards for employees in his category had been pulled. Headon was told that he would be notified when to return to work. The labor dispute was settled Friday, March 6. The ships which had been withdrawn from the plant began to return and Headon was notified March 7 to report back to work March 9, which he did. Those ships which were not in the yard but scheduled to arrive for service during the week in question did not thereafter come into the Company's plant but did go to competitive plants, with consequent loss in amounts stipulated to the Company.

It was stipulated that had the vessels which withdrew remained and had those scheduled for repairs not diverted their course or delayed entry into the plant, there would have been sufficient work for appellee and the other claimants involved. There is no disagreement between the parties to this appeal as to the facts and circumstances leading up to and resulting in Headon's unemployment. The controverted question is whether or not appellee's unemployment was directly due to a labor dispute within the terms of Code 1940, Title 26, Sec. 214, subd. A.

Appellee's contention is summarized in the following proposition set forth in his brief:

Where a wage reopening occurred which rendered inoperative a no-strike clause in the current labor contract but no strike was called and negotiations were proceeding peacefully, the removal by customers of their ships from the shipyard because of fears that negotiations might break off, which removals caused disruption of the work schedules and temporary layoffs, did not make the ensuing unemployment "directly due to a labor dispute" so as to disqualify workers for unemployment benefits under Title 26, Section 214, subd. A, Code of 1940.

Many cases from this and other states are cited as supportive of this proposition. Much of the argument is devoted to the historic background of Section 214, subd. A of the Code, supra, as traced through successive legislative enactments and our prior decisions. We will not here enter upon a critical analysis of these cases, repeating the reasoning and pronouncements therein given. To do so would be merely a work of supererogation. Reduced to its essence, appellee's contention is that, in the light of the evidence summarized above, appellee's "temporary layoff was due to the fears of others, namely, the shipowners, and not the fear of the Company. In short, the unemployment was directly due to a lack of work and not to a labor dispute." Chief reliance is rested upon Department of Industrial Relations v. Stone, 36 Ala.App. 16, 53 So.2d 859, and Gulf Atlantic Warehouse v. Bennett, 36 Ala.App. 33, 51 So.2d 544.

Appellant's contention is in direct contradiction of appellee's insistence, and is summarized in the single proposition stated in the words of the statute, Sec. 214, subd. A, supra, thus:

"An individual shall be disqualified for total or partial unemployment: For any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed."

In essence, the argument is that if there had been no labor dispute, appellee and the

other claimants would not have been unemployed, hence such unemployment was directly due to the labor dispute in active progress in the establishment where they were last employed. Chief reliance is rested by appellants upon Department of Industrial Relations v. Savage, 38 Ala.App. 277, 82 So.2d 435, and Department of Industrial Relations v. Walker, 40 Ala.App. 1, 109 So.2d 131, affirmed in 268 Ala. 507, 109 So.2d 135.

At the outset, counsel for appellee says "we feel there was no 'labor dispute' as that term has been 'refined' by this court in the Stone case," supra.

Any question as to what does or does not constitute a labor dispute has long been set at rest by our cases of Ex parte Pesnell, 240 Ala. 457, 199 So. 726 (reviewing and approving the opinion of this court reported in 29 Ala.App. 528, 199 So. 720); Department of Industrial Relations v. Savage, supra; Department of Industrial Relations v. Walker, supra. It has been consistently held that in order to establish a labor dispute precluding a recovery of unemployment benefits, it is not necessary that there be a strike or lockout, and repeatedly reproduced the statutory definition of a labor dispute.

That there was a labor dispute in progress at the time of appellee's layoff is unquestionably shown by the evidence we have noted above. The question of a change in wage rates was negotiated, debated, argued by the two committees over a period of several weeks, and these negotiations were in progress at the time involved, but existence or not of a labor dispute is not the determinative question. The question is whether the unemployment involved was due directly to the labor dispute which was in existence. Answer to this question must be arrived at by an appraisal of the facts in the particular case. The Stone case, 36 Ala.App. 16, 53 So.2d 859, relied upon by appellant, is of little value, being predicated upon a finding that the dispute on the part of the employer in that case was not *bona fide*. No such question is here involved or suggested. The Stone case went into a detailed résumé of the historical background of the law, stated numbers of statutory interpretations and made some observations out of which counsel for appellee finds comfort. We find them of small pertinence here. Nor can we agree that the term labor dispute has been "refined" by the Stone case. Somewhat closer by analogy is Gulf Atlantic Warehouse v. Bennett, 36 Ala. App. 33, 51 So.2d 544. In that case there was in progress negotiations between the employee's union and the employer, in other words, a labor dispute was created and existed. Pending negotiations this employer being apprehensive that there might be a walkout or work stoppage at the expiration of the current contract gave notice to this effect to its customers. The customers thereupon ordered substantial amounts of cotton shipped from the company's warehouse and shipments into the establishment practically ceased. This continued for a considerable time and resulted in no available work for claimants. This court reached the conclusion that the cessation of work was due to under-production; that this condition was due to the company's apprehension of a strike or work stoppage and on this account its customers ceased active business relations with the warehouse. The unemployment we said, was directly due to a *misapprehension* of the customers and not a labor dispute between the claimants and the company. In conclusion this court said:

"In the instant case an agency independent of the labor dispute intervened and became the cause of the unemployment. Under such circumstances it cannot be logically deduced that the time of unemployment, for which compensation is sought was 'directly due to a labor dispute.' "

We are unable to give the effect to the decision in the Bennett case contended for by appellee's counsel. That decision and the reasoning expressed must be taken in the light of its own peculiar facts. In that case the conclusion was reached that the unemployment was the result of an intervening, efficient agency, independent of the existing labor dispute, that is, the mis-

apprehension of the customers of the employer. In that case nothing is said of a threatened strike merely that the employer became apprehensive of a walkout, and so notified its customers who thereupon withheld patronage. In the present case the deadline for negotiation of a new contract was fixed at midnight on March 1, 1959. On the day before that date, February 28, the members of the local union met and voted to authorize their bargaining agent to call a strike. This fact was publicized by the press and furnished notice to shipowners of the probability of a strike. Without dispute the consequences to shipowners of a strike in the shipyard were well known and clearly understood. If a ship was in the yard undergoing or awaiting repairs, such work would stop. If the ship waited until the strike was in effect and then withdrew, no other union would work on the ship. If a ship scheduled to come in for repairs entered in disregard of warning of a threatened strike, it would run the risk of becoming strikebound, or a "hot" ship. There can be no doubt that should this happen there would be a large financial loss to the owners of all vessels involved. It cannot be said that shipowners withdrawing from or refusing to enter the shipyard acted upon a misapprehension merely because the strike did not eventuate. On the contrary, they took reasonable precautionary measures. To give to the Bennett case the broad application contended for by appellee's counsel, we would run counter to the opinion of the Supreme Court in the Pesnell case and the other cases following in its wake by this and the Supreme Court. By adopting appellee's theory, we would place ourselves in the untenable position of pronouncing that any unemployment resulting from lack of or withdrawal of patronage by customers must be treated as directly due to the intervening act of the third party customers, notwithstanding they so acted by reason of the labor dispute, unless there was a strike or lockout. In this case it cannot be said that the action of the shipowners constituted the intervention of an agency independent of the labor dispute in progress; rather it was a consequence of the strike vote.

Had there been no labor dispute, there would have been no reason for withholding patronage on the part of these customers. The situation resulting in the unemployment was brought on by the existing labor dispute. This being so, it must follow that the unemployment of appellee and other claimants was directly due to a labor dispute.

We observe some dissatisfaction on the part of appellants with some of the reasoning and observations in the Bennett case. We content ourselves with the statement that that case must be taken and applied in the light of its own peculiar facts.

It is our judgment that our cases of Savage and Walker, together with the opinion of the Supreme Court in the Walker case, though not identical factually with the present case, more nearly state and apply the general rules and should be followed in this case.

We have not overlooked the out-of-state cases brought to our attention. Our examination of those decisions reveals either a different statutory provision or a divergent factual situation. As pointed out by the Supreme Court in the Pesnell case, "Authorities elsewhere are of little value".

It results as our considered judgment that appellee's partial unemployment was directly due to the labor dispute then in progress and that his claim should have been denied.

The judgment appealed from is reversed and remanded with directions that a judgment be entered for appellants.

Reversed and remanded with directions.

CATES, Judge (dissenting).

The stipulation states that claimant-appellee is "entitled to unemployment compensation unless disqualified under Section 214-A." The last paragraph of the stipulation reads:

"It is further stipulated between the parties that the claimant Headon did

 

not work from the termination of the second shift, working overtime through Friday night to Saturday morning, February 28, 1959, at 6:30 a. m., until the commencement of the second shift on Monday, March 9, 1959, anything in the Record to the contrary notwithstanding."

The applicability of Code 1940, T. 26, § 192, has not been shown. This section reads as follows:

" 'Week', as used in this chapter, means such period of seven consecutive days, as the director may by regulation prescribe. The director may by regulation prescribe that a week shall be deemed to be in, within, or during that benefit year which includes the greater part of such week, or that benefit year within which such week ends."

This record fails to show that Headon had served the waiting period prescribed by Code 1940, T. 26, § 213, subsec. D.

However, from the regulations of the Director, which, under Broadway v. Ala. Dry Dock & Shipbuilding Co., 246 Ala. 201, 20 So.2d 41(12), we must take by judicial notice, it was possible for the claimant to have had a prior waiting period served in the same benefit year or possibly enough unemployment between February 28 and March 9 to meet the test though this seems but remotely possible.

Subject to this qualification, I would vote to affirm the judgment below.

In Department of Industrial Relations v. Savage, 38 Ala.App. 277, 82 So.2d 435, no independent act of a customer was shown to have intervened; ceramic kilns need lead time to warm and cool, hence an ultimatum's deadline actually for some branches of the work was practically effective sooner than in some later phases of work on down the line.

I cannot distinguish causation here from that in Gulf Atlantic Warehouse Co. v. Bennett, 36 Ala.App. 33, 51 So.2d 544. The majority opinion here says *vessels were moved from the yard.* Is this use of the passive voice without saying by whom (other than the master, mates and men who, by law, are licensed to man, victual and navigate them) an artful or careless omission?

The *shipowners* feared a strike that never came. Our statute says "directly due" to a labor dispute. I have heard no voice raised against Bennett.

I must respectfully dissent.

PRICE, Presiding Judge (rehearing).

After careful consideration of this cause on rehearing, I have reached the conclusion that the judgment appealed from should be affirmed. The opinion of Judge Cates thus becomes the majority opinion.

The application for rehearing is granted and the cause affirmed.

Application for rehearing granted.

Affirmed.